IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JASON DANIEL MENDELSON,
      Petitioner,

vs.                         Case No.:  5:16cv85/WTH/EMT

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 6).  Petitioner is represented by counsel.  Respondent filed an answer and relevant portions of the state court record (ECF No. 16).  Petitioner filed a reply (ECF No. 27).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the

opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 16).[1]  Petitioner was charged in the Circuit Court in and for Bay County, Florida, Case No. 2007-CF-3540, with one count of Home Invasion Robbery with a Firearm—Principal (Count I) and one count of Grand Theft—principal (Count II) (Ex. A at 71–72).[2]  Following a jury trial, he was found guilty as charged on Counts I and II, with a specific jury finding that Petitioner actually possessed a firearm (Ex. A at 96–97).  On October 1, 2008, Petitioner was sentenced as a prison releasee reoffender to life imprisonment on the home invasion robbery count, and a concurrent term of five years in prison on the grand theft count, with pre-sentence jail credit of 362 days on both counts (Ex. A at 103–09, 139–55).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D08-5361 (Ex. B).  The First DCA

---

[1] Citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 16).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

[2] Petitioner was also charged with Possession of a Firearm by a Convicted Felon, but the State nolle prossed the charge.

affirmed the judgment per curiam without written opinion on April 30, 2010, with the

mandate issuing June 30, 2010 (Exs. E, H).  Mendelson v. State, 37 So. 3d 853 (Fla.

1st DCA 2010) (Table).

On August 3, 2009, Petitioner filed a motion for post-conviction relief, pursuant

to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. I at 285–308).

Petitioner subsequently "supplemented" the motion with an addition claim (id. at

377–81).  The state circuit court summarily denied one of Petitioner's claims (Ground

One) and ordered an evidentiary hearing on the remaining four claims (id. at 593–96).

Following a limited evidentiary hearing (see id. at 1053–1140), the circuit court

denied Petitioner's Rule 3.850 motion (id. at 972–87).  Petitioner appealed the

decision to the First DCA, Case No. 1D14-0612 (Ex. J).  The First DCA affirmed the

lower court's decision per curiam without written opinion on October 6, 2014, with

the mandate issuing December 5, 2014 (Exs. M, P).  Mendelson v. State, 151 So. 3d

1237 (Fla. 1st DCA 2014) (Table).

On January 27, 2015, Petitioner filed a motion to correct sentencing error in the

state circuit court, pursuant to Rule 3.800(a) of the Florida Rules of Criminal

Procedure (Ex. Q at 1–17).  The circuit court denied the motion in an order rendered

September 4, 2015 (id. at 20–21).  Petitioner appealed the decision to the First DCA,

Case No. 1D15-4524 (Ex. R).  The First DCA affirmed the lower court's decision per

curiam without written opinion on February 29, 2016, with the mandate issuing May

3, 2016 (Exs. S, V).  Mendelson v. State, 198 So. 3d 634 (Fla. 1st DCA 2016) (Table).

Petitioner commenced the instant federal habeas action on March 14, 2016

(ECF No. 1).

II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody

pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death

Penalty Act of 1996 ("AEDPA").  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim—
>
> > **(1)**  resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > **(2)**  resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in the
> > State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review

in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The

appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under
> the "unreasonable application" clause, a federal habeas court may grant
> the writ if the state court identifies the correct governing legal principle
> from this Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

<u></u>*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the <u>Williams</u> framework, on any issue raised in a federal habeas

petition upon which there has been an adjudication on the merits in a state court

proceeding, the federal court must first ascertain the "clearly established Federal law,"

namely, "the governing legal principle or principles set forth by the Supreme Court

at the time the state court render[ed] its decision." <u>Lockyer v. Andrade</u>, 538 U.S. 63,

71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established"

only when a Supreme Court holding at the time of the state court decision embodies

the legal principle at issue.  <u>Thaler v. Haynes</u>, 559 U.S. 43, 47, 130 S. Ct. 1171, 175

L. Ed. 2d 1003 (2010); <u>Woods v. Donald</u>, — U.S. —, 135 S. Ct. 1372, 1376, 191 L.

Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for

purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See* Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)). If the state court decision is contrary to clearly established federal law, the

federal habeas court must independently consider the merits of the petitioner's claim.

See Panetti v. Quarterman, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662

(2007).

If the "contrary to" clause is not satisfied, the federal habeas court next

determines whether the state court "unreasonably applied" the governing legal

principles set forth in the Supreme Court's cases.  The federal court defers to the state

court's reasoning unless the state court's application of the legal principle(s) was

"objectively unreasonable" in light of the record before the state court.  Williams, 529

U.S. at 409; see Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed.

2d 683 (2004) (per curiam).  In applying this standard, the Supreme Court has

emphasized:

> When reviewing state criminal convictions on collateral review, federal
> judges are required to afford state courts due respect by overturning their
> decisions only when there could be no reasonable dispute that they were
> wrong.  Federal habeas review thus exists as "a guard against extreme
> malfunctions in the state criminal justice systems, not a substitute for
> ordinary error correction through appeal."  Harrington, supra, at
> 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

Woods, 135 S. Ct. at 1376 (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct.

770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* <u>Gill v. Mecusker</u>, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." <u>Brumfield v. Cain</u>, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear

and convincing evidence." *Id.*; *see, e.g.*, Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").  Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *See* Cave v. Sec'y for Dep't of Corr., 638 F.3d. 739 (11th Cir. 2011).  However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision."  Gill, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied the AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti, 551 U.S. at 954.  Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this

standard is difficult to meet, that is because it was meant to be." <u>Richter</u>, 562 U.S. at 102.

## III.    EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  <u>Duncan</u>,

---

[3] Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
        (A)  the applicant has exhausted the remedies available in the courts of the State; or
                (B) (i)  there is an absence of available State corrective process; or
                   (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* 459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39

(1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." Anderson, 459 U.S. at 7.  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  *Id.*, 459 U.S. at 7 & n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

Years later the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim

---

[4]The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." Duncan, 513 U.S. at 365–66.

In Baldwin v. Reese, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." 541 U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004). The Baldwin Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" Id., 541 U.S. at 32. With regard to this statement, the Eleventh Circuit stated in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal

judiciary.'" <u>McNair</u> [<u>v. Campbell</u>], 315 F. Supp. 2d [1277,] 1184 [(M.D. Ala. 2004)] (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[5]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. <u>Bailey v. Nagle</u>, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See* <u>Coleman v. Thompson</u>, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); <u>Caniff v. Moore</u>, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts.");

---

[5] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." <u>McNair v. Campbell</u>, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  *Id*.  A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 151 L. Ed. 2d 820 (2002).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state

procedural rules to resolve the federal claim.[6]  *Id.*  Second, the state court's decision

on the procedural issue must rest entirely on state law grounds and not be intertwined

with an interpretation of federal law.  *Id.*  Third, the state procedural rule must be

adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must

be firmly established and regularly followed, that is, not applied in an arbitrary or

unprecedented fashion.  *Id.*

      To overcome a procedural default, the petitioner must show cause and prejudice

or a fundamental miscarriage of justice in order for the federal habeas court to reach

the merits of a claim.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to

exist, an external impediment, whether it be governmental interference or the

reasonable unavailability of the factual basis for the claim, must have prevented

petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct.

1454, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106

S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).  To satisfy the miscarriage of justice exception,

the petitioner must show that "a constitutional violation has probably resulted in the

conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115

---

[6] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*  Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence.  *See* McQuiggin v. Perkins, — U.S. —, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013).  As the Court stated in Schlup, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]."  513 U.S. at 332; *see also* House v. Bell, 547 U.S. 518, 537, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

Within this framework, the court will review Petitioner's claims.

## IV.    PETITIONER'S CLAIMS

A.    Ground One:  "Trial counsel rendered ineffective assistance in failing to investigate or present available exculpatory evidence and in failing to cross examine crucial state witnesses with such evidence."

Petitioner asserts that the State's time-line of the home invasion robbery was that it occurred between 11:30 p.m. and midnight on September 8, 2007 (ECF No. 6 at 16, 19–22).[7] Petitioner alleges his cell phone records, which the State obtained and disclosed to the defense during pre-trial discovery, showed that his cell phone was "pinging" off a cell phone tower in "close proximity" to the victims' (Mr. and Mrs. Sharpe) home at 11:19 p.m. and not earlier (*id.*). Petitioner alleges Mrs. Sharpe stated, in a sworn statement to law enforcement at 1:31 a.m. on September 9, 2007, that she and Mr. Sharpe were watching the last few minutes of a college football game when three armed men entered their residence (*id.*). Mrs. Sharpe also stated that prior to joining her husband to watch the game, she was counting money in the kitchen, between 10:00 and 10:30 p.m. (*id.*). Petitioner alleges the football game, which was Auburn versus South Florida, started at 7:08 p.m. and ended at 10:49 p.m. (*id.*). Petitioner contends that because his cell phone records established he was not in close proximity to the Sharpes' home prior to 11:19 p.m., the records were exculpatory and thus should have been used by defense counsel (*id.*).

---

[7] Page references to the parties' pleadings are to the page numbers automatically assigned by the court's electronic filing system rather than the page numbers assigned by the parties in the original documents.

Petitioner contends defense counsel, Rudolph "Rusty" Shepard, was ineffective for not properly investigating the cell phone records (ECF No. 6 at 19–20).  Petitioner argues that had Attorney Shepard done so, he would have realized that the records supported Petitioner's defense, and that the State manipulated the time-line of the robbery to give the appearance that Petitioner participated in the robbery (*id.*).

Petitioner additionally contends Attorney Shepard was ineffective for failing to impeach the testimony of one of the State's key witnesses, Justin Griffin, with the cell phone records (ECF No. 6 at 21–22).  Petitioner alleges Griffin was charged as a participant in the robbery and agreed to plead guilty to the offense (a life felony) in exchange for a 10-year sentence and his testimony at the trial of Petitioner and the other co-defendant, David Locke (*id.*).  Petitioner asserts Justin Griffin testified that he was "made to do this robbery," that he was "very afraid of Mendelson" after "having seen what he was capable of," and that he had no communication or contact with Petitioner after the robbery (*id.*).  Petitioner alleges the cell phone records indicated that Griffin attempted to call Petitioner 35 times after the robbery, and that Griffin even invited Petitioner to his wedding, which took place after the robbery (*id.*).  Petitioner alleges Attorney Shepard attempted to impeach Griffin with the cell phone records, but failed to lay a proper foundation and was thus unable to do so (*id.*).

Petitioner contends if Attorney Shepard had properly prepared himself to use the cell phone records to impeach Griffin's testimony, the records would have proven that Griffin lied in his trial testimony (*id.*).

Petitioner asserts he presented this ineffective assistance of trial counsel ("IATC") claim as Ground Two of his Rule 3.850 motion (ECF No. 6 at 16, 19).

Respondent contends Petitioner failed to demonstrate that the state court's rejection of this claim was an unreasonable application of clearly established federal or based on an unreasonable factual finding (ECF No. 16 at 8–20).

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of Strickland is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms.  Strickland, 466 U.S. at 688–89, 691.  "The petitioner's

burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).

Professionally competent assistance includes a duty to conduct a reasonable investigation. *See* Strickland, 466 U.S. at 690–91. The Supreme Court has

emphasized that only when counsels' choices are made after a "thorough investigation of law and facts relevant to plausible options" are those choices "virtually unchallengeable." *Id.* at 690. When, however, "strategic choices [are] made after less than complete investigation [they] are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. Thus, at bottom, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances . . . ." *Id.* at 691. This means that when a court assesses the attorney's decision not to investigate, it "must consider . . . whether the known evidence would lead a reasonable attorney to investigate further." Wiggins v. Smith, 539 U.S. 510, 527, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Jones v. GDCP Warden, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting Strickland, 466 U.S.

at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. Williamson v. Fla. Dep't of Corr., 805 F.3d 1009, 1016 (11th Cir. 2015) (citing Richter, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncrasies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 694–95. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal. *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. Strickland, 466 U.S. at 698; Collier

v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting Strickland's high bar

is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176

L. Ed. 2d 284 (2010).  "Establishing that a state court's application of Strickland was

unreasonable under § 2254(d) is all the more difficult."  Richter, 131 S. Ct. at 788.

As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly
> deferential," and when the two apply in tandem, review is "doubly" so.
> The Strickland standard is a general one, so the range of reasonable
> applications is substantial.  Federal habeas courts must guard against the
> danger of equating unreasonableness under Strickland with
> unreasonableness under § 2254(d).  When § 2254(d) applies, the
> question is not whether counsel's actions were reasonable.  The question
> is whether there is any reasonable argument that counsel satisfied
> Strickland's deferential standard.

Id. (citations omitted).

### 2.    Federal Review of State Court Decision

Petitioner presented this IATC claim as Ground Two of his Rule 3.850 motion

(Ex. I at 298–302).  In the state circuit court's written decision denying the claim, the

court correctly stated the deficient performance and prejudice prongs of the Strickland

standard as the applicable legal standard (id. at 979).  The court adjudicated the claim

as follows:

> In ground two, the Defendant, claiming that he was elsewhere
> when the home invasion robbery of the Sharpes took place, asserts that

his trial counsel rendered ineffective assistance of counsel in failing to investigate or present certain exculpatory evidence in the form of cellular telephone records, and in failing to cross-examine State witnesses Griffin and Kearns with that evidence.  According to the Defendant, the cellular telephone records would have shown that he was at another location when the Sharpes were robbed at their home.   Additionally, they allegedly would have contradicted Griffin's testimony that he was in fear of the Defendant and sought to avoid him after the robbery, as they indicate that after the robbery Griffin made repeated calls to the Defendant. . . .

. . . .

At the evidentiary hearing, the Defendant testified that he had discussed the cellular telephone records with his trial counsel, Rusty Shepard.  He states that he told Shepard the cellular telephone records would prove that he was not "in the area at the time that the crime happened."  He also states that he told Shepard the cellular telephone records would "impeach certain witnesses that were testifying against" him.   The cellular telephone records themselves were admitted by agreement of the parties during the testimony of State witness Jason Daffin.

The Court agrees with the State that at the evidentiary hearing, the Defendant failed to present sufficient evidence to support his claim, and thereby shift the burden of proof to the State to present contradictory evidence. *Pennington [v. State]*, 34 So. 3d [151,] 154–55 [(Fla. 1st DCA 2010)].  Though the Defendant testified that he told Shepard the cellular telephone records would prove that he was not "in the area at the time that the crime happened," the Court finds that he did not present any evidence that the cellular telephone records would actually prove that. Indeed, the cellular telephone records themselves were not admitted until State witness Daffin testified.   The Court further finds that the Defendant's additional testimony that the cellular telephone records would "impeach certain witnesses that were testifying against" him was too vague and general to support a finding of a deficient performance for purposes of *Strickland*.   However, even to assume for the sake of argument that the Defendant did present sufficient evidence to support

his claim, the Court also finds that in any event, the State rebutted the Defendant's evidence.

First, much to the contrary of the Defendant's position, the cellular telephone records were very incriminating, and actually placed him near the Sharpes' residence at the time of the instant offenses on the night of September 8, 2007.  At the evidentiary hearing, State witness Daffin, an investigator with the Bay County Sheriffs Office, testified that the instant offenses took place "[a]round 11:30 p.m."  The closest cellular telephone tower to the Sharpes' residence was at St. Andrews State Park.  According to Daffin, the cellular telephone records show that the Defendant's cell phone pinged off the tower at St. Andrews State Park once at 11:18 p.m. and then twice at 11:19 p.m. on the night of September 8, 2007.  Then, there was a period of silence from 11:20 p.m. until 1:00 a.m. on September 9, 2007.  During that period, the records reflected that his cell phone was set to call forwarding.  After that period, the next ping was on September 9, 2007 at about 1:00 a.m. off of the "PCB Coast Guard" cellular tower.  Trial counsel Shepard testified that he chose not to use the records as exculpatory evidence because they placed the Defendant near the Sharpes' residence at the time of the instant offenses and also showed that he was "awake and active" during that time as his phone had been placed on and off of call forwarding.  In Shepard's view, the records constituted the State's "most damaging piece of evidence."  Under these circumstances, Shepard plainly could not have been ineffective for deciding not to use the cellular telephone records to show that the Defendant was elsewhere during the home invasion robbery of the Sharpes.

Next, the State presented sufficient evidence to establish that trial counsel Shepard was not ineffective for deciding not to seek the admission of the cellular telephone records at trial to contradict Griffin's testimony that he was in fear of the Defendant and sought to avoid him after the robbery.  As indicated, according to the Defendant, the cellular telephone records demonstrated that after the robbery, Griffin made repeated calls to the Defendant.  At the evidentiary hearing, trial counsel Shepard testified that Griffin indicated his fear of the Defendant after the

robbery took place, but also took actions inconsistent with that, including inviting the Defendant to his wedding after the robbery. Thus, Shepard sought to impeach Griffin's testimony by using the cellular telephone records and pointing to his action of inviting the Defendant to his wedding. However, because the records otherwise constituted the State's "most incriminating piece of evidence," the "last thing" he wanted to do was "get a records custodian there to get the telephone records in." Accordingly, Shepard sought to reference the records to impeach Griffin's testimony without actually seeking their admission into evidence. The record reflects that Shepard did indeed attempt to challenge Griffin's testimony in that manner by casting his attempt in terms of refreshing Griffin's recollection with the records, before being thwarted by the State and the Court. The record also reflects that Shepard sought to impeach Griffin's testimony with his sworn statement to law enforcement, in which Griffin admitted inviting the Defendant to his wedding. Under the circumstances, trial counsel Shepard was not ineffective and acted reasonably in not seeking the outright admission of the records to impeach Griffin's testimony, particularly since, as discussed, the records were potentially very incriminating to the Defendant.

. . . In short, the Court concludes that ground two fails to pass muster under either prong of *Strickland*.

(Ex. I at 979–81). The First DCA affirmed this decision without written opinion (Ex. M).

Petitioner contends the state court's factual determination, that the cell phone records were incriminating, was unreasonable (ECF No. 27 at 2–5). In support of this argument, Petitioner requests that this court take judicial notice of the ESPN broadcast of the Auburn versus South Florida football game available on

https://www.youtube.com/watch?v=G_u_U8pT4jw (*see id.* at 2–3). Petitioner alleges

the broadcast demonstrates that the football game ended at 10:49 p.m. Central time

(*id.*).

To the extent Petitioner seeks to use the ESPN broadcast to demonstrate the

unreasonableness of the state court's factual findings, Supreme Court precedent

precludes him from doing so. "If a claim has been adjudicated on the merits by a state

court, a federal habeas petition[er] must overcome the limitation of § 2254(d)(1) on

the record that was before that state court." *See* Cullen v. Pinholster, 563 U.S. 170,

185, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011) (footnote omitted). Likewise, review

of a claim under § 2254(d)(2) is specifically limited to "evidence presented in the

State court proceeding." 28 U.S.C. § 2254(d)(2). Thus, as a general rule, district

courts may not expand the record or conduct evidentiary hearings to supplement the

existing state court record under 28 U.S.C. § 2254(d). *See* Frazier v. Bouchard, 661

F.3d 519, 528 (11th Cir. 2011) (limiting review under § 2254(d)(1) to record before

state court, and refusing to consider expanded record presented to district court);

Moore v. Mitchell, 708 F.3d 760, 780–81 (9th Cir. 2013) (federal habeas court could

not consider additional evidence not before state courts, even though parties jointly

moved to expand the record); <u>Ballinger v. Prelesnik</u>, 709 F.3d 558, 561 (6th Cir. 2013).

Additionally, although federal habeas courts may take new evidence in an evidentiary hearing, § 2254(e)(2) imposes a limitation on the discretion of the federal courts.  *See* <u>Pinholster</u>, 563 U.S.  at 184–86.  The court may hold an evidentiary hearing only if Petitioner shows that:

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

Here, the parties do not dispute that the state court adjudicated the merits of the IATC claim presented here in Ground One.  Therefore, Petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court.  Petitioner does not allege, nor does the record of the Rule 3.850 proceeding indicate, that the

state court was either presented with evidence, or asked to take judicial notice, of the time that the Auburn versus South Florida football game ended on September 8, 2007. Additionally, Petitioner has not shown that the factual predicate of his IATC claim could not have been discovered, through the exercise of due diligence, at the time of the evidentiary hearing in the Rule 3.850 proceeding.  Therefore, this federal habeas court will not take judicial notice of, or otherwise consider, the proffered evidence of when the Auburn football game ended on September 8, 2007.

To overcome the deference due to the state court's factual determination that the cell phone records were incriminating, Petitioner must demonstrate by clear and convincing evidence that the state court record reflected an insufficient factual basis for affirming the state court's decision.  *See* Gill, 633 F.3d at 1292.  Petitioner has not done so here.  The transcript of the post-conviction evidentiary hearing shows that there was a sufficient factual basis for the state court's determination that the cell phone records placed Petitioner near the Sharpes' residence at the time when other evidence indicated the Sharpes' home was robbed.

At the post-conviction evidentiary hearing, the court took judicial notice of the trial transcripts (*see* Ex. I at 1055).  Additionally, records from Petitioner's cell phone

were admitted as State's Exhibit 4 at the evidentiary hearing (*see* Ex. I at 783, 854–933, 1138).

According to the trial transcripts, Mary Jane Sharpe testified that at approximately 10:30 p.m. on September 8, 2007, she and her husband were watching the end of a football game in their living room when they heard a "bam" (Ex. A, Transcript of Trial Proceedings, pp. 165–77). Mrs. Sharpe testified that she remained in the living room "just a little bit," and then went into the kitchen (*id.* at 177). She testified that when she entered the kitchen, there were two men standing in the kitchen, and a third man was coming in (*id.* at 177–78). She testified the men had kicked open the locked back door to the residence (*id.* at 178). Mrs. Sharpe testified that all three men had guns (*id.*). Mrs. Sharpe testified that for the next 30–45 minutes, the men robbed her and her husband, and then tied them up in the bedroom (*id.* at 178–88). Mrs. Sharpe testified that the men then returned to the kitchen and were there "for a little bit" (*id.* at 188). She testified that she and her husband called the Sheriff's Department "probably within ten minutes" after they realized the robbers were gone (*id.*).

James Sharpe testified that at the end of the Auburn versus South Florida football game on September 8, 2007, three men broke into the house and robbed them (Ex. A, Transcript of Trial Proceedings, pp. 200–09).

Justin Griffin testified that he, Petitioner, and David Locke robbed the Sharpes on September 8, 2007 (Ex. A, Transcript of Trial Proceedings, pp. 34–81).  Griffin testified that Petitioner and Locke picked him up at a bar across the street from the Sharpes' residence at approximately 11:00 to 11:30 p.m. (*id.* at 72, 80).  Griffin testified that after the robbery, the three of them drove to the Days Inn and then to Cook's motel on Middle Beach Road (*id.* at 65–66).

During Attorney Shepard's cross-examination at trial, Justin Griffin initially testified he never had contact with Petitioner or co-defendant Locke after the night of the robbery (Ex. A, Transcript of Trial Proceedings, p. 74).  Without actually using Petitioner's cell phone records, Attorney Shepard was able to obtain an admission from Griffin that not only was this testimony untrue, but Griffin lied to Investigator Daffin when he told Daffin that he contacted Petitioner only once after the robbery:

> Q [by Attorney Shepard].  All right.  And how many times did you say that . . . you talked with Jason Mendelson 35 times after this happened, didn't you, 35, didn't you?
>
> A.  I don't know.

Q.  You don't know.  But it was more than once, don't you [sic]?

A.  No.

Q.  You don't?  Your Honor, may I approach the witness.

THE COURT:  Let me ask you to approach for a second.

## AT THE BENCH

THE COURT:  There is no requirement that you approach the witness.  What are you trying to do?

MR. SHEPARD:  Refreshing his recollection.

MR. GRAHAM [the prosecutor]:  You're not going to refresh his memory with cell phone records.  You have to have a—

MR. SHEPARD:  Refreshing his recollection, you can do it with anything.

THE COURT:  I thought you were impeaching him.  What are you doing?

MR. SHEPARD:  Not at this point, no, I'm refreshing his recollection.

THE COURT:  What dates, because after he was arrested, wasn't it on October 5th?

MR. SHEPARD:  We're talking September 10th through September 29th.

THE COURT:  Why don't you ask him did you make cell phone calls to him.

MR. SHEPARD:  I just asked him if he talked to him.

THE COURT:  Ask him what his phone number was then you can show it to him.

MR. GRAHAM:  There is no proponent for it.

MR. SHEPARD:  This isn't coming in as evidence.

MR. GRAHAM:  You can't use it if it's not coming in.

THE COURT:  You have to lay a better foundation before I let you get into this, lay a foundation.

<u>IN OPEN COURT</u>

BY MR. SHEPARD

Q.  Sir, you can't remember how many times you called him, can you?

A.  No, sir.

Q.  But it was numerous?

A.  I don't know, sir.

Q.  And this is someone you say that you were scared of?

A.  Yes, sir.

Q.  Yet you invited him to your wedding after this robbery and you called him numerous times, correct?

A.  I don't know, sir.

Q.  So, in sum, sir, you lied to the police, correct?

A.  Yes, sir.

Q.  You don't remember how many calls you made to Jason Mendelson after this was over, someone you say that you're horribly afraid of, correct?

A.  Yes, sir.

(Ex. A, Transcript of Trial Proceedings, pp. 74–78).

At the post-conviction evidentiary hearing, Jason Daffin, an investigator with the Bay County Sheriff's Office, testified that the robbery took place "[a]round 11:30 p.m." on September 8, 2007 (Ex. I at 1131–35).  Daffin testified that the robbery was reported to the Sheriff's Office at approximately 12:04 a.m. in the early morning of September 9 (*id.*)  Investigator Daffin testified that the closest cellular telephone tower to the Sharpes' residence was the cell tower at St. Andrews State Park, which was less than one mile from the Sharpes' residence (*id.*).  Daffin testified that Petitioner lived near the Middle Beach cellular tower (*id.*).  According to Investigator Daffin, Petitioner's cell phone records showed that Petitioner's cell phone "pinged" off the cell tower at St. Andrews State Park once at 11:18 p.m. and then twice at 11:19 p.m. on September 8, 2007 (*id.* at 1133–34).  Daffin testified that the cell phone records showed that there was a period of silence from 11:20 p.m. on September 8, 2007, until

1:00 a.m. on September 9, 2007, during which time Petitioner neither initiated or answered calls (*id.* at 1134). Investigator Daffin testified that the cell records indicated that after that period, the next "ping" was at approximately 1:00 a.m. on September 9, 2007, off of the PCB Coast Guard cellular tower (*id.*).

It is clear from the record presented to the state court in the post-conviction proceeding that the only evidence of precise timing with respect to the robbery was Investigator Daffin's testimony that the Sharpes reported the robbery to the Sheriff's Office at 12:04 a.m. The other evidence regarding timing was stated in terms of approximation, including Justin Griffin's testimony regarding when Petitioner called him and picked him up to go to the Sharpes, and Mrs. Sharpe's testimony regarding when she joined her husband in the living room, when they heard the noise in the kitchen, how long the robbery lasted, how long the robbers remained in the kitchen after they left the Sharpes tied up in the bedroom, and how long the Sharpes waited before calling the Sheriff's Office. In light of the evidence presented to the state post-conviction court, there was a sufficient factual basis for the state court's factual determination that Petitioner's cell phone records placed Petitioner near the Sharpes' residence during the time frame of the robbery.

Given the fact that Petitioner's cell phone records placed him near the Sharpes' residence during the time frame of the robbery, the next question is whether the state court unreasonably applied <u>Strickland</u> in concluding that Attorney Shepard was not ineffective for failing to use Petitioner's cell phone records.

At the post-conviction evidentiary hearing, Attorney Shepard testified regarding his decision not to use Petitioner's cell phone records. Attorney Shepard testified he was "very" aware of Petitioner's cell phone records, which the State had supplied through discovery (Ex. I at 1099–1101). Attorney Shepard testified that the phone records were not helpful to Petitioner's defense for the following reason:

> Immediately—well, during the period of time that it was alleged the robbery happened his phone was on call-forward which indicated that apparently the calls, he wasn't going to take calls, they had been forwarded to another number. The robbery was to have taken place over a period of time and I can't remember exactly what that was, about an hour, hour and-a-half, something like that. And an hour and-a-half later the phone gets turned off call-forward and he begins, I can't remember if he was calling or receiving, but the phone is in use. And again it shows him on the beach, in the general area that the robbery had occurred. I also thought that, you know, the time of the robbery was the middle of the night so I thought that not only the fact that the call had been, the calls were on call-forward but the fact that it had been placed on and pulled off call-forwarding in the middle of the night indicated that certainly he was awake and active during that period of time. Quite honestly, I was surprised that the prosecution didn't use them because I really thought that those were quite simply the most damaging piece of evidence they had.
>
> . . . .

How I approach cases is what would I argue if I was the prosecutor and if I was a prosecutor I would have drove home, well, what do you do, you put your call on forward when you're visiting, you don't want to get a telephone call, well, what is going on during that period of time, the robbery. Where is he? He's on the beach. So I was trying to stay away form that as much as I could.

Q [by Petitioner's collateral counsel]: And you talked about how the time of the robbery—

A. And so, I'm sorry. So I mean, . . . most people or many people that would be on a jury would also find it curious that he's active on the phone immediately before and immediately after the time that the robbery was supposed to have occurred.

Q. Did you have a fixed time?

A. We didn't but we had abouts and the abouts were very similar to the period of time that his call was on forward and it was on forward for a period of time that the robbery could have occurred, it certainly could have been argued and I didn't want that argument to be made.

(Ex. I at 1101–02, 1121–22).

Attorney Shepard also testified regarding his attempt to use Petitioner's cell phone records during his cross-examination of Justin Griffin without actually admitting the phone records into evidence or providing the State an opportunity to do so:

Q [by the State]. During the trial do you remember trying to impeach another of the state's witnesses, and as cooperating witness and he had been a co-defendant and that would have been Griffin?

A.  Yes, sir.

Q.  Griffin was one of the people that had entered into a plea agreement with the state, he was one of the robbers and basically he was saying I robbed, I helped in the robbery and Locke and Mendelson were there too?

A.  Yes.

Q.  Essentially he indicated he was afraid Locke and Mendelson, right?

A.  He did.

Q.  And you tried to impeach him during the trial?

A.  Absolutely.

Q.  And how did you go about doing that, sir?

A.  Well, to me, I think he had invited Jason to his wedding after the robbery would have occurred and that just made no sense at all to me. And there were a number of actions that he had made that just didn't jive with what he was trying to say.

Q.  And did you try to impeach him by talking about these telephone records?

A.  Yeah, you bet.

Q.  If you would tell us.

. . . .

A.  My recollection is I was trying to kind of get into it with him and really, I mean, I'm not trying to tell tales out of school but Judge Costello just did not like that and I tried to, you know, I was trying to

call it all kinds of things, refreshing his recollection, I was really trying hard to do it and at some point she just told me to move on.

Q.  And we have, I guess this would be State's Exhibit 2, portions of that, that would be Pages 74, 75, 76, 77, 78, 79 and then I guess part of your closing argument at 388.  For the record will you review that and make sure that those are some of your questions during the cross examination of Mr. Griffin during the trial of the defendant in this case?

A.  Yes, sir.

Q.  So is that a copy of the [trial] transcript, sir, do you recall that as being a copy of the transcript and those specific pages, do they reference your attempt to impeach Griffin about the cell phone records and of his actions of inviting Defendant Mendelson to his wedding?

A.  Yes, sir.

Q.  And you argued that in your closing that is attached also?

A.  Yes, sir.

Q.  That portion.  You say you were trying to go further but Judge Costello and Mr. Graham prevented you from doing so?

A.  They did.  And it was a little bit of a dilemma because, as I mentioned, the telephone records were just horribly damning, so the last thing I wanted to do was get a records custodian there to get the telephone records in because the telephone records, as I mentioned, as I said, I thought were the most incriminating piece of evidence the state had.  So if the state wasn't going to call them I sure wasn't going to get AT&T there and give the state the opportunity to get those in.  And that presented a problem with regard to impeachment.  I mean, basically I don't have anybody who can come up and substantiate the numbers but, I mean, at the same time it is kind of a calculated thing.  I mean, that presented a problem for us but certainly there could have been a far

worse harm done had, in my opinion, had the, if they found out that he basically turned off his phone during the heart of the robbery and was awake and on the beach.

(Ex. I at 1104–06, 1121–22).

Mark Graham, the prosecutor during Petitioner's jury trial, agreed with Attorney Shepard that Petitioner's cell phone records were incriminating to Petitioner (Ex. I at 1123–24, 1127–29). Prosecutor Graham testified he chose not to admit all of the evidence that incriminated Petitioner, including Petitioner's cell phone records and photographs of Petitioner and co-defendant Locke in Las Vegas "spending money like wild" after the robbery (*id.*).

Petitioner contends the state court unreasonably applied the performance prong, because Attorney Shepard could not have reasonably decided that the cell phone records were "the most damaging piece of evidence the state had on his client," nor could Shepard have reasonably decided that further investigation into the potential exculpatory value of the records would have been fruitless (ECF No. 27 at 3–5). Petitioner additionally contends the state court's determination, that Petitioner failed to satisfy Strickland's prejudice prong, was unreasonable (*id.* at 4–5). Petitioner contends the cell phone records placed Petitioner near, but not at, the site of the robbery (*id.* at 5). Petitioner contends the prejudice is "self-evident," because the cell

phone records established he was not at the scene of the robbery when it took place, and the records showed that Justin Griffin was lying (*id.*).

In light of the state court's reasonable factual finding that Petitioner's cell phone records placed him near the Sharpes' residence during the time frame of the robbery, the state court reasonably concluded that Attorney Shepard's decision not to admit the records, or provide the State an opportunity to do so by having them authenticated, and instead attempting to use them only to refresh Justin Griffin's recollection about the number of times he called Petitioner after the robbery, was not deficient (i.e., a decision that no competent counsel would make). Additionally, the state court reasonably concluded that Petitioner failed to establish a reasonable probability that the jury would have rendered a different verdict if Attorney Shepard had admitted Petitioner's cell phone records into evidence either as substantive evidence or for impeachment of Justin Griffin.

Petitioner failed to satisfy § 2254(d) with respect to the state court's adjudication of the merits of Ground One. Therefore, Petitioner is not entitled to expansion of the record, an evidentiary hearing, or federal habeas relief on this claim.

B.     Ground Two:  "Trial counsel rendered ineffective assistance in failing to call an available, materially exculpatory witness."

Petitioner alleges Tucy Lipecki was available to testify at trial (ECF No. 6 at 16, 22–24).  Petitioner alleges Ms. Lipecki would have testified that Samantha Kearns told her that she (Kearns) and her boyfriend, Patrick Wilson, were planning to rob the Sharpes (*id.*).  Petitioner alleges Ms. Lipecki also would have testified that Samantha Kearns went on a spending spree after the Sharpes were robbed (*id.*).  Petitioner alleges Lipecki's testimony would have painted Kearns and Wilson as active participants in the robbery instead of mere accessories after the fact, which are the charges to which they pled (*id.*).  Petitioner allege both he and his fiancée, Tanya Lund, told Attorney Shepard that he needed to speak with Tucy Lipecki (*id.*).  Petitioner also alleges he told his first defense attorney, Thomas Cassidy, about Lipecki and asked Cassidy to depose her (*id.*).  Petitioner asserts he presented this claim as Ground Three of his Rule 3.850 motion (*id.* at 16, 22).

Respondent contends Petitioner failed to demonstrate that the state court's rejection of this claim was an unreasonable application of clearly established federal law, or that it was based upon an unreasonable factual finding (ECF No. 16 at 20–24).[8]

### 1.    Clearly Established Federal Law

------

[8] Although the heading of Respondent's answer to this claim states that the claim is unexhausted, Respondent does not mention exhaustion in the body of her argument (*see* ECF No. 16 at 20–24).

Case No.:  5:16cv85/WTH/EMT

The Strickland standard, set forth *supra*, governs this claim.

2.   Federal Review of State Court Decision

Petitioner presented this claim as Ground III in his Rule 3.850 motion (Ex. I at 302–04).   Petitioner expressly identified Attorney Shepard as the defense attorney whose conduct was allegedly unconstitutional (*see id.* at 303).   Petitioner alleged that Tucy Lipecki's testimony would have convinced the jury that Samantha Kearns had planned the robbery, and that Patrick Wilson, not Petitioner, had carried it out (*id.* at 304).   The state circuit court adjudicated the IATC claim as follows:

> In ground three, the Defendant asserts that his trial counsel rendered ineffective assistance of counsel in failing to call Tucy Lipecki as a defense witness at trial.   He alleges that Lipecki was available to testify and that trial counsel Shepard knew about her.   According to the Defendant, Lipecki would have testified that she had personally observed Kearns and Wilson plan the robbery of the Sharpes, and that Wilson was going to commit the robbery with two other individuals. Lipecki had been a houseguest and knew where their firearms and cash were located. Lipecki also would have testified that Kearns had discussed how the robbery proceeds were to be divided, and that after the robbery Kearns purchased various personal items with cash.   The Defendant argues that he was prejudiced by trial counsel's alleged ineffectiveness because if Lipecki had testified, her testimony would have supported his defense that Kearns had actively planned the robbery and carried out that robbery with her boyfriend Wilson.

> At the evidentiary hearing, the Defendant stated that he had discussed with his trial counsel Shepard about Lipecki being a potential witness.   According to the Defendant, his fiancee Tonya [sic] Lund had spoken with Lipecki, who allegedly was aware of conversations that

Kearns and Wilson had had previously, prior to his [Petitioner's] release from prison on February 23, 2007 on unrelated charges, about "trying to hire somebody or get somebody to do something with the victims in the case."

Lund testified that she had two conversations with Lipecki. Her testimony on direct was vague and referenced only the first conversation, which took place when she spoke with Lipecki in the parking lot at Walmart in 2007, "right when [the instant offenses] happened." Lund also stated that she told trial counsel Shepard that he "needed to" speak with Lipecki. On cross- examination, Lund stated that Lipecki "had heard a while back that she [Kearns] was looking for people to do something with the victims." However, she also acknowledged that Lipecki did not relate the details of what she testified to at the evidentiary hearing until her second conversation with Lipecki, which took place sometime in 2010 when Lund visited her at the jail. According to Lund, during that second conversation, Lipecki stated that Kearns "was rounding, trying to find people to do basically her dirty work."

Lipecki testified that Kearns told her that she and Wilson "were about to rob the guy that owns Everything's A Dollar." Kearns "knew where everything was there, that he, that she was employed by him and they were nice and they took her in, fed her, paid her good and everything else." Lipecki indicated that after the robbery, Kerns went on a shopping spree. Lipecki indicated that she had been contacted by a defense lawyer back in 2007 or 2008 but acknowledged, "I don't really remember it very much." She did state that she would have testified if she had been asked to do so. On cross-examination, Lipecki indicated that the first time she spoke with Lund was actually in 2010, when she was in jail. Lipecki acknowledged that Kearns did not tell her who was involved in the plan to rob the Sharpes other than Kearns and Wilson. Nor did Kearns tell her any of the details, including when the robbery was going to take place, other than Kearns knowing where everything was located inside the Sharpes' home. After the robbery took place, Kearns did not tell her about the details.

Trial counsel Shepard testified, "To my knowledge the first time that I have ever seen Tucy Lipecki was here today in court." Reference was made to Kearns in her deposition identifying a friend of the Defendant's significant other as "2C," but Shepard acknowledged that there was no last name attributed to that individual and there was no indication that the individual had any relevant information about the case. Shepherd stated that in reviewing all the notes from his conversations with the Defendant, he did not see anywhere in the notes the name Tucy Lipecki. He recalled Lund telling him that "Kearns was dirty basically," but he did "not recall anything about Tucy Lipecki." Similarly, neither prosecutor Mark Graham nor investigator Daffin recalled Lipecki's name ever coming up.

The Court finds that at the evidentiary hearing, the Defendant failed to carry his burden of providing sufficient evidence to support his claim. *Pennington*, 34 So. 3d at 154. The testimony on whether trial counsel Shepard was ever informed of Lipecki's availability as a witness was conflicting, but the Court finds Shepard's testimony to be more credible, and notes that it is buttressed with Graham's and Daffin's testimony. Moreover, even to assume for the sake of argument that Shepard had been informed, it is evident from both Lund's and Lipecki's testimony that Lipecki's would-be testimony would have done little or nothing to help the Defendant's case. The jury already knew from Kearns's and Wilson's testimony that the two had some connection to the robbery. While Lipecki's testimony placed the culpability for the actual planning of the robbery on Kearns and Wilson, it otherwise lacked details that might have served to exonerate the Defendant, such as which specific individuals Kearns and Wilson were recruiting to assist them in the robbery and when the robbery was going to take place. Accordingly, the Court concludes that for purposes of *Strickland*, Shepard could not have been ineffective for failure to call Lipecki as a witness, because her testimony would have done little or nothing to help the Defendant's case, much less affect the outcome of the trial. In short, the Court determines that the Defendant's claim fails under both prongs of *Strickland*.

(Ex. I at 981–82).  The First DCA affirmed this decision without written opinion (Ex. M).

The state court record demonstrates that Tucy Lipecki testified at the evidentiary hearing that prior to the robbery, she and Samantha Kearns were friends and co-workers at Walmart (Ex. I at 1083–84).  Ms. Lipecki testified that Samantha Kearns told her that she and her boyfriend were going to rob the owner of Everything's A Dollar (*id.* at 1084).  Lipecki testified that Kearns told her that she knew "where everything was" inside the Sharpes' home (*id.* at 1084, 1090).  Ms. Lipecki testified that Samantha Kearns told her that she previously worked for the Sharpes and they "took her in, fed her, paid her good," and were nice to her (*id.*).  Ms. Lipecki testified that Kearns did not tell her when the robbery was going to take place, or who was going to be involved in the robbery plan besides her and her boyfriend, Patrick (*id.* at 1090).  Ms. Lipecki testified that  approximately two weeks later, Samantha Kearns told her that she had some money, and then Kearns quit her job at Walmart and went on a shopping spree, including buying a "really big" diamond ring at Walmart (*id.* at 1085–86).  Lipecki testified that Samantha Kearns did not mention anything about having committed a robbery or participating in a robbery, but when Lipecki saw Kearns' diamond ring, Kearns said, "I did it" (*id.* at 1086).  Ms. Lipecki

testified that Kearns also told her that she buried some money in a Mason jar (*id.*).

Lipecki testified that if she had been asked to testify at Petitioner's trial, she would

have done so (*id.* at 1087). Ms. Lipecki testified that she spoke with Petitioner's

girlfriend (Tanya Lund) about Samantha Kearns, but the conversation did not take

place until 2010, when Lipecki was in the county jail, which was after Petitioner's

trial in 2008 (*id.* at 1089–92).

Tanya Lund, Petitioner's fiancée, testified at the evidentiary hearing that she

had a conversation with Tucy Lipecki in 2007 in the Walmart parking lot (Ex. I at

1094–95). Ms. Lund testified that Lipecki told her that she (Lipecki) "heard awhile

back that she [Samantha Kearns] was talking about this" and that Kearns "was looking

for people to do something with the victims" and "trying to find people to do basically

her dirty work" (*id.* at 1094–96). Ms. Lund testified that prior to Petitioner's trial, she

told Attorney Shepard that he needed to speak with Tucy (*id.* at 1097).

Attorney Shepard testified that he recalled Ms. Lund telling him that Samantha

Kearns was "dirty," but he did not recall her mentioning Tucy Lipecki (Ex. I at 1107).

Shepard testified that he reviewed all his notes from his pre-trial conversations with

Petitioner, but did not see a reference to Tucy Lipecki in his notes (*id.*). Attorney

Shepard testified that Samantha Kearns referenced "2C" as a friend of Petitioner's

significant other in Kearns' pre-trial deposition, but the reference did not lead him

(Shepard) to believe that the person had any relevant information that would have

been helpful to the defense (*id.* at 1108–09). Shepard testified that he did not recall

Petitioner ever talking about Tucy Lipecki (*id.* at 1107, 1109).

Samantha Kearns' pre-trial deposition was part of the post-conviction record

(Ex. I at 784–835). At the time of the deposition, Petitioner was represented by

Thomas Cassidy (*see id.*). In the deposition, Kearns stated that she had met Tanya,

Petitioner's "significant other," because she and Tanya worked at Walmart and they

had a mutual friend "2C" (*id.* at 812–13). Samantha Kearns stated that "2C" also

worked at Walmart (*id.* at 813). Kearns stated that "2C" was the woman's "real" first

name, but Kearns did not know her last name (*id.*).

In assessing the effect, if any, of Tucy Lipecki's omitted testimony on the

outcome of Petitioner's trial, the court must consider it in the context of the testimony

that was presented at trial. Samantha Kearns testified that she began working at

Walmart in June or July of 2007 (Ex. A, Transcript of Trial Proceedings, p. 107). She

testified that in July of 2007, Petitioner asked her about Mr. Sharpe, or "Big Daddy"

(*id.* at 109). Kearns testified that Petitioner asked her if Mr. Sharpe had a lot of

money, where he lived, and the type of vehicle he drove (*id.*). Kearns testified that

she told Petitioner that Mr. Sharpe owned four stores, that he had money and paid his

employees in cash, and that he lived behind his store on Thomas Drive (*id.*).  Kearns

testified that Petitioner made a statement suggesting that both of them could rob the

Sharpes (*id.*).  She testified that she told Petitioner not to rob the Sharpes; that "Big

Daddy" had guns and would shoot him; that Sharpe had surveillance in his house; that

Sharpe had two sons; and that "they" would get caught if "they" did it (*id.*).  Kearns

testified that she did not think Petitioner was serious about robbing the Sharpes (*id.*

at 109–10).  Kearns testified that at 1:00 a.m. on the morning of September 9, 2007,

Petitioner, David Locke, and Shawn Sheridan came to her home (*id.* at 111).  She

testified that Petitioner threw $5,000.00 on the couch and said, "We did it, it's done."

(*id.* at 111–13).  Kearns testified that David Locke gave her boyfriend, Patrick Wilson,

a wad of $2 bills (*id.*).  She testified that Petitioner told her and Patrick not to say

anything and to keep their mouths shut (*id.* at 114).  Kearns testified that she and

Patrick Wilson spent the $5,000.00 and buried the $2 bills in the back yard (*id.* at

114–15, 135).  Kearns admitted that she was initially charged with accessory-after-

the-fact in the Sharpe robbery (*id.* at 119).  She testified she entered a plea to a

reduced charge of dealing in stolen property (*id.* at 120).

During cross-examination, Samantha Kearns admitted that she knew that Mr. Sharpe carried a lot of cash on his person, that he had at least one firearm in his house, and that Mrs. Sharpe collected items of value (Ex. A, Transcript of Trial Proceedings, pp. 121–22).  Kearns also repeated her testimony that she and Patrick Wilson spent $5,000.00 of the robbery proceeds, and that they spent some of it shopping at the mall (*id.* at 124, 133).  Kearns denied that she ever planned the robbery with Petitioner (*id.* at 128).  Kearns admitted that she initially told police on September 25, 2007, that she did not know anything about the robbery, but then told them everything she knew two days later (*id.* at 118–19, 132).  Kearns admitted that when she worked for the Sharpes, she knew where they lived and that they had surveillance cameras (*id.* at 136).  She admitted that she had been to the Sharpes' home many times and knew their two sons (*id.* at 137).  Kearns admitted that she knew that the Sharpes "didn't believe in banks," and that they paid their employees in cash (*id.*).  Kearns also admitted that she shared this information with Patrick Wilson (*id.* at 136–37).

Nathaniel McMillan testified that he was living with Samantha Kearns and Patrick Wilson in September of 2007 (Ex. A, Transcript of Trial Proceedings, p. 332). He testified that law enforcement officers came to the house and questioned Samantha and Patrick about the Sharpe robbery (*id.* at 333).  McMillan testified that after the

officers left the house, Samantha and Patrick seemed "shocked and freaked out, kind of scared that they had done something wrong." (*id.*).  McMillan testified that Patrick showed him gold rings with "money symbols" on them, a gold bracelet, and a Rolex watch with diamonds around the face (these were among the items of jewelry taken from the Sharpes during the robbery) (*id.* at 334).  Mr. McMillan testified that Patrick was bragging about the jewelry and "showing it off" (*id.* at 335).  McMillan testified that he saw $10,000–20,000.00 in Patrick's wallet (*id.*).  McMillan testified that Patrick Wilson asked him to help dispose of the $2 bills, because he was afraid he would be linked to the robbery (*id.* at 336).  McMillan testified that Samantha Kearns also told him that she was worried about being implicated as a suspect in the robbery (*id.*).

The jury also heard the testimony of Justin Griffin, who described how he, Petitioner, and David Locke robbed the Sharpes (Ex. A, Transcript of Trial Proceedings, p. 34–80).  And the jury heard testimony from law enforcement officers, that they discovered items stolen from the Sharpes in the apartment shared by Petitioner and Locke (*id.*, pp. 226–30, 233–66).

In the state post-conviction proceeding, the question of <u>Strickland</u> prejudice boiled down to whether Petitioner demonstrated a reasonable probability that the jury

would have acquitted him of the robbery if Tucy Lipecki had testified that prior to the robbery, Samantha Kearns told her that she and her boyfriend were going to rob the owner of Everything's A Dollar and that she knew "where everything was" inside the Sharpes' home, and after the robbery, Kearns had a lot of money and told Lipecki that she (Kearns) "did it." Although the jury certainly may have concluded, upon hearing this testimony, that Samantha Kearns was more involved in the robbery than she admitted to law enforcement and in her trial testimony, the state court reasonably determined there was no reasonable probability the jury would have had reasonable doubt that Petitioner was a principal in the robbery.

Petitioner failed to establish that the state court's adjudication of this IATC claim was based upon an unreasonable determination of fact, or that the state court unreasonably applied Strickland in rejecting this claim. Therefore, Petitioner is not entitled to federal habeas relief on Ground Two.

### C.    Ground Three:  "Trial counsel rendered ineffective assistance in failing to move to sever Mendelson's trial from co-defendant Locke's either before or during trial."

Petitioner alleges during trial, the jury heard testimony (from Mr. Sharpe, Mrs. Sharpe, and Justin Griffin) that co-defendant Locke sexually assaulted both Mr. and Mrs. Sharpe during the course of the robbery (ECF No. 6 at 16, 25–29). Petitioner

argues that if his trial had been severed from co-defendant Locke's trial, this evidence would not have been properly admitted, because its prejudicial effect would have outweighed any probative value (*id.* at 29). Petitioner contends a reasonably competent defense attorney would have moved to sever Petitioner's trial from Locke's (*id.*). Petitioner asserts he presented this IATC claim as Ground Four of his Rule 3.850 motion (*id.* at 16, 25).

Respondent concedes the state court adjudicated this IATC claim on the merits (ECF No. 16 at 24–28). Respondent contends the state court determined that, as a matter of state law, a motion to sever would have been denied (*id.* at 28). Respondent contends this determination of state law is binding on this federal habeas court, and in light of this finding, the state court reasonably rejected Petitioner's IATC claim (*id.*).

       1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

       2.    Federal Review of State Court Decision

Petitioner presented this IATC claim as Ground IV of his Rule 3.850 motion (Ex. I at 304–06). The state circuit court adjudicated the claim as follows:

> In ground four, the Defendant argues that his trial counsel rendered ineffective assistance of counsel in failing to move to sever his

trial from his codefendant Locke either before or during the trial.  Citing to *Coleman v. State*, 610 So. 2d 1283, 1285 (Fla. 1992), *cert. denied*, 114 S. Ct. 321 (1993 ), he argues that when one codefendant's defense blames another and antagonistic evidence is entered toward the other codefendant, severance is appropriate.  He alleges that before trial, trial counsel Shepard moved to exclude evidence that an uncharged sexual battery had been committed against Mr. Sharpe with the barrel of a shotgun.  According to him, the State's theory was that Locke had committed the sexual battery of Mr. Sharpe while Mendelson was in another room, holding a gun on Mrs. Sharpe.  However, Shepard's motion was denied and the evidence of Locke's uncharged sexual battery was brought before the jury.  The Defendant further alleges that Mr. Sharpe specifically identified Locke in front of the jury but did not so identify him, that Locke's trial counsel recognized that the two codefendants had antagonistic defenses and moved to sever the cases, and that it was clear to Locke's trial counsel that Shepard was attempting to show that Locke was culpable while the Defendant was not.  Finally, the Defendant alleges that the evidence from the search disclosed that the vast majority of inculpatory evidence came from Locke's bedroom, with "only one piece" of inculpatory evidence coming from the Defendant's bedroom.

At the evidentiary hearing, the Defendant stated that his trial counsel Shepard originally planned to have him stand up and show how he is six foot three or six foot four whereas the victims testified that the robbers were between five foot six and five foot eight.  The Defendant otherwise indicated he was under the assumption that his trial counsel's strategy was one that comported with the defense of his codefendant Locke, and indicated his surprise over his trial counsel's closing argument, which was apparently to the contrary, because he thought that "in a joint trial the defense is supposed to be somewhat common, at least a common theory of defense anyway."

The Court finds that at the evidentiary hearing, the Defendant failed to carry his burden of providing sufficient evidence to support his claim with respect to severance.  *Pennington*, 34 So. 3d at 154.  As

indicated, at the evidentiary hearing the Defendant expressed surprise over trial counsel Shepard's closing argument at trial and opined that in a joint trial there should be a "common theory of defense."  To be sure, trial counsel Shepard did argue that the evidence pointed to Locke rather than to the Defendant with regard to what was found during the search. (T 398–99)[FN 3]  Also to be sure, Locke's trial counsel did move for severance on several occasions, arguing at one juncture during Shepard's closing argument, "[I]f we had a common defense to this point, now essentially my co-counsel is throwing me under the bus."  (T 397–98). However, the Defendant otherwise failed to present evidence or argument showing that Shepard should have sought severance.

Even to assume for the sake of argument that the Defendant did present sufficient evidence or argument to support his claim, the Court also finds that in any event, the State rebutted the Defendant's claim, because in the Court's view Shepard's explanation for not seeking severance is more persuasive.  At the evidentiary hearing, Shepard explained that he did not want to seek severance once the State was not going to "get into the phone records," which, as discussed were very incriminating to the Defendant, because the Defendant otherwise had some "good things" going [for] him with respect to the evidence. The men seen running in the surveillance video all appeared to be roughly the same size, but in fact the Defendant is noticeably taller than Locke. Additionally, during the search of the apartment and Locke's vehicle, almost all of the evidence seized "was really found in what could be considered . . . Locke's presence," so the argument could have been made that "with Locke and all that property" some could have "dribbled over" to the Defendant.  The Court concludes that the trial strategy as explained by Shepard was reasonable in light of the evidence and does not constitute ineffective assistance of counsel. *See Coleman v. State*, 64 So. 3d 1210, 1221 (Fla. 2011) ("Strategic decisions made by counsel which are reasonable under the norms of professional conduct do not constitute 'ineffective assistance of counsel.'  Furthermore, a strong presumption exists that the challenged action constitutes sound trial strategy on the part of the defense.") (citation omitted).  Just because the complained-of trial strategy did not ultimately work does not mean that

counsel was ineffective.  *See Mansfield v. State*, 911 So. 2d 1160, 1174 (Fla. 2005) ("[A]n attorney is not ineffective for decisions that are a part of a trial strategy that, in hindsight, did not work out to the defendant's advantage.").   Accordingly, the Court determines that trial counsel's performance was not deficient for purposes of *Strickland*.

Further, even had Shepard moved for a severance after arguing that the evidence pointed to Locke, it would have been subject to denial under the case law.  As the Florida Supreme Court explained in *McCray v. State*, 416 So. 2d 804, 807 (Fla. 1982), "We reiterate that hostility among defendants or the desire of one defendant to exculpate himself by inculpating a codefendant are insufficient grounds, in and of themselves, to require separate trials."  Indeed, as noted, the Court denied Locke's motion to sever, which sought severance on similar grounds.  *Coleman*, cited by the Defendant, does not require severance, and notably *Coleman* cites to *McCray* for the proposition that a strategic advantage or hostility among defendants does not in itself require severance. *Coleman*, 610 So. 2d at 1285.   Accordingly, the Court concludes that for purposes of *Strickland*, trial counsel Shepard could not have been ineffective for failure to seek severance in light of *McCray*.

Finally, even if severance had been granted, at the evidentiary hearing prosecutor Mark Graham testified that he still would have sought to put into evidence at a separate trial for the Defendant the amount of force and violence used during the home invasion robbery by all of the robbers involved, including Locke.  It appears that such evidence would have included the uncharged sexual battery committed by Locke upon Mr. Sharpe; as indicated, Shepard did attempt to seek the exclusion of that evidence with his motion in limine.  Under the circumstances, the Court also determines that there was no prejudice for purposes of *Strickland*.  In short, the Court determines that the Defendant's claim fails to pass muster under either prong of *Strickland*.

(Ex. I at 982–84) (footnote omitted).  The First DCA affirmed this decision without written opinion (Ex. M).

The state court's determination that a motion to sever would have been properly

denied under state law is entitled to deference.  *See* <u>Bradshaw v. Richey</u>, 546 U.S. 74,

76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005) (federal habeas court must abide by the

state court's interpretation of state law); <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 691, 95

S. Ct. 1881, 44 L. Ed. 2d 508 (1975).

Additionally, there is no reasonable probability that a motion to sever based

upon federal constitutional grounds would have been granted.  Petitioner argues he

was denied a fair trial, because the jury heard evidence (specifically, testimony from

Mr. Sharpe, Mrs. Sharpe, and Justin Griffin) that co-defendant Locke sexually

assaulted Mr. and Mrs. Sharpe during the course of the robbery (*see* ECF No. 27 at

12–16).  Petitioner contends "[t]he prejudicial effect of this extraordinarily gruesome

testimony poisoned the trial for Mendelson . . . ." (*id.* at 16).

"Joint trials play a vital role in the criminal justice system."  <u>Zafiro v. United</u>

<u>States</u>, 506 U.S. 534, 537, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993) (quotation marks

omitted); <u>Richardson v. Marsh</u>, 481 U.S. 200, 209, 107 S. Ct. 1702, 95 L. Ed. 2d 176

(1987).  The general rule or preference is that defendants indicted together should be

tried together.  *See* <u>Zafiro</u>, 506 U.S. at 537–38; <u>United States v. Baker</u>, 432 F.3d 1189,

1236 (11th Cir. 2005).  "Joint trials generally serve the interests of justice by avoiding

inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit." <u>Richardson</u>, 481 U.S. at 210.  The Supreme Court has admonished that "[i]t would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand."  *Id.*  Joint trials have long been a common and preferred procedure in both federal and state courts.

Trial courts have discretion to grant a severance if a defendant carries his burden to show both that (1) a joint trial would actually prejudice the defendant and (2) a severance is the proper remedy for the prejudice, rather than jury instructions or another remedy.  *See* <u>Zafiro</u>, 506 U.S. at 539–41[9]; <u>United States v. Browne</u>, 505 F.3d 1229, 1268–69 (11th Cir. 2007); *see also* <u>United States v. Blankenship</u>, 382 F.3d 1110, 1122 (11th Cir. 2004) (noting that in <u>Zafiro</u>, "the Supreme Court set down a

_____

[9] The Eleventh Circuit has recognized that although <u>Zafiro</u> is a not a constitutional case, and is instead based upon a Federal Rule of Criminal Procedure, the decision informs analysis of a habeas petitioner's claim that a joint trial violated his right to a fair trial guaranteed by the Due Process Clause.  *See* <u>Hardy v. Comm'r, Ala. Dep't of Corr.</u>, 684 F.3d 1066, 1078 & n.13 (11th Cir. 2012); <u>Puiatti v. McNeil</u>, 626 F.3d 1283, 1309–10 (11th Cir. 2010).

two-step test for determining whether a defendant is entitled to a new trial due to a district court's refusal to sever").

As to the first <u>Zafiro</u> step, a defendant "must carry the heavy burden of demonstrating the lack of a fair trial due to actual, compelling prejudice." <u>United States v. Chavez</u>, 584 F.3d 1354, 1360 (11th Cir. 2009); *see also* <u>United States v. Gari</u>, 572 F.3d 1352, 1365 (11th Cir. 2009) ("We will not reverse the denial of a severance motion absent a clear abuse of discretion resulting in compelling prejudice against which the district court could offer no protection." (quoting <u>United States v. Walser</u>, 3 F.3d 380, 385 (11th Cir. 1993))); <u>United States v. Novaton</u>, 271 F.3d 968, 989 (11th Cir. 2001) (stating a defendant must discharge the "'heavy burden' of demonstrating 'compelling prejudice' from the denial of a motion to sever" (quoting <u>United States v. Pepe</u>, 747 F.2d 632, 650–51 (11th Cir. 1984))).   In <u>Zafiro</u>, the Supreme Court explained that "[m]utually antagonistic defenses are not prejudicial per se." <u>Zafiro</u>, 506 U.S. at 538; *see* <u>Blankenship</u>, 382 F.3d at 1122 (stating <u>Zafiro</u> "specifically rejected the notion that defendants who have contradictory defenses are inherently prejudiced").   And "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." <u>Zafiro</u>, 506 U.S. at 540.

As to the second <u>Zafiro</u> step, severance is not automatically required even if prejudice is shown.  *See* <u>Puiatti</u>, 626 F.3d at 1310 (citing <u>Zafiro</u>, 506 U.S. at 539–40). A court's limiting instruction to the jury will often cure any prejudice resulting from a joint trial.  *See* <u>Zafiro</u>, 506 U.S. at 539.

"Under <u>Zafiro</u>, there are only two circumstances in which severance is mandatory:  where there is a serious risk that a joint trial (1) 'would compromise a specific trial right of one of the defendants,' or (2) would 'prevent the jury from making a reliable judgment about guilt or innocence.'"  <u>Puiatti</u>, 626 F.3d at 1310 (quoting <u>Zafiro</u>, 506 U.S. at 539, 113 S.Ct. at 938); *see also* <u>Blankenship</u>, 382 F.3d at 1122–23.  Aside from the two categories of defendants specified by the Supreme Court in <u>Zafiro</u>, "most other defendants prejudiced by a joint trial are entitled only to curative instructions." <u>Blankenship</u>, 382 F.3d at 1123.

In <u>Blankenship</u>, the Eleventh Circuit stated that the first scenario for "mandatory severance" described by the Supreme Court in <u>Zafiro</u> "exists only where a joint trial leads to the denial of a constitutional right."  382 F.3d at 1123.  For example, in <u>DeLuna v. United States</u>, 308 F.2d 140 (5th Cir. 1962), the Court of Appeals recognized that a defendant is denied a fair trial when an attorney for a co-defendant comments on his exercise of his Fifth Amendment right to remain silent.

The court held, "If an attorney's duty to his client should require him to draw the jury's attention to the possible inference of guilt from a co-defendant's silence, the trial judge's duty is to order that the defendants be tried separately." *Id.* at 141. Similarly, a defendant's Sixth Amendment right to cross-examine is violated where the court admits into evidence a mutually incriminating confession of a co-defendant who does not take the stand.  The Eleventh Circuit has repeatedly recognized that, even if given proper limiting instructions, a jury cannot possibly be expected to consider such a confession against only the defendant who made it. *See* <u>Schaffer v. United States</u>, 221 F.2d 17, 19 (5th Cir. 1955) ("We believe, however, that the two defendants were so inseparably connected that the jury could hardly have been expected to return a verdict of guilty against one and of not guilty as to the other.").

"Regarding the second scenario mentioned by <u>Zafiro</u>, the Court did not clearly explain what it meant by a jury being prevented from 'making a reliable judgment.'" <u>Blankenship</u>, 382 F.3d at 1123.  The Eleventh Circuit noted that this scenario applies in primarily three situations. *Id.*

First, a severance is mandated where compelling evidence that is not admissible against one co-defendant is to be introduced against the other co-defendant. *See* <u>Blankenship</u>, 382 F.3d at 1123.  For example, "where the . . . gruesome evidence

against one defendant overwhelms the de minimus evidence against the co defendant."

*Id*. (internal quotation marks and citation omitted).    "In general, the strong presumption is that jurors are able to compartmentalize evidence by respecting limiting instructions specifying the defendants against whom the evidence may be considered."  *Id.*

> The mere fact that there may be an "enormous disparity in the evidence admissible against [one defendant] compared to the other defendants" is not a sufficient basis for reversal.  A defendant does not suffer compelling prejudice, sufficient to mandate a severance, simply because much of the evidence at trial is applicable only to co-defendants.

United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997) (internal quotation marks and citation omitted); *see also* United States v. Balter, 91 F.3d 427, 433 (3d Cir. 1996) ("Prejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts against each defendant or some evidence adduced is more damaging to one defendant than others.") (quotation marks and citations omitted). "Severance must be granted where evidence is admissible against only one defendant only where that evidence is so convincing that not even limiting instructions are likely to prevent the jury from considering the evidence against all co-defendants." Blankenship, 382 F.3d at 1124.  "The presumption that a jury will adhere to a limiting instruction evaporates where there is an overwhelming probability that the jury will

be unable to follow the court's instructions and the evidence is devastating to the defense." United States v. Jones, 16 F.3d 487, 493 (2d Cir. 1994).  In such cases, the better course of action is to have separate trials in order to confine such powerful evidence to the defendants against whom it may properly be used.  Blankenship, 382 F.3d at 1124.

Second, the "reliable judgment" exception also applies in "an extremely narrow range of cases in which the sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence, makes it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently."  Blankenship, 382 F.3d at 1124.

Third, severance is required under Zafiro where one defendant is being charged with a crime that, while somehow related to the other defendants or their overall criminal scheme, is significantly different from those of the other defendants.  *See* Blankenship, 382 F.3d at 1125.

Here, Petitioner's severance argument, that due process required a severance because of the prejudicial effect of evidence that co-defendant Locke sexually assaulted Mr. and Mrs. Sharpe during the course of the robbery, falls under the second scenario mentioned by Zafiro, i.e., the jury was prevented from "making a reliable

judgment." According to the Eleventh Circuit, this scenario applies where "compelling evidence that is not admissible against one co-defendant is to be introduced against the other co-defendant." <u>Blankenship</u>, 382 F.3d at 1123.

Petitioner's claim rests on the theory that evidence of a sexual battery of Mr. Sharpe and a sexual battery of Mrs. Sharpe was inadmissible against Petitioner, because only co-defendant Locke engaged in this conduct. The evidence at issue includes testimony of Mr. and Mrs. Sharpe and Justin Griffin. Justin Griffin testified that at one point during the robbery, he and Petitioner located a shotgun, and then co-defendant Locke took it (Ex. A, Transcript of Trial Proceedings, p. 48). Griffin testified that co-defendant Locke cocked the gun and then poked Mr. Sharpe in the stomach and testicles, and tried to stick it in Mr. Sharpe's rectum (*id.*). Griffin testified that at one point, Mrs. Sharpe opened a safe for him (Griffin), and she accompanied him outside to a vehicle, where Griffin recovered cash from the center console (*id.* at 50). Griffin testified that co-defendant Locke threatened to kill Mr. Sharpe at least two or three times (*id.* at 51). Griffin testified that Locke also threatened to rape Mrs. Sharpe (*id.* at 68–69). Griffin testified that he did not hear Petitioner threaten anyone (*id.* at 51).

During Mrs. Sharpe's testimony, she referred to the three robbers as "the runner" (according to Justin Griffin's testimony, he was the runner), "the tallest robber" (according to Griffin, this was Petitioner), and "the robber with the silver gun" (according to Griffin, this was co-defendant Locke). Mrs. Sharpe testified that "the tallest robber" stayed with her constantly with a gun to her head (*see* Ex. A, Transcript of Trial Proceedings, pp. 179, 189). Mrs. Sharpe testified that she was on the kitchen floor, and "the tallest robber" was punching the gun into her head and threatened to kill her if she did not lie still and be quiet (*id.* at 182 ). Mrs. Sharpe testified that "the robber with the silver gun" hit Mr. Sharpe on the head and kept hitting him (*id.* at 179–81, 189). Mrs. Sharpe testified that "the robber with the silver gun" was the leader (*id.* at 180, 189). Mrs. Sharpe testified that after two of the robbers took Mr. Sharpe to the bedroom, "the tallest robber" pulled her up off the kitchen floor and took her to the bedroom (*id.* at 182). She testified that "the robber with the silver gun" kept yelling for money and hitting Mr. Sharpe on the head (*id.* at 182–83). Mrs. Sharpe testified that "the robber with the silver gun" then took one of Mr. Sharpe's shotguns and popped one of the shells out (*id.* at 183). She testified that this robber told Mr. Sharpe that he would kill him, and shoved the shotgun "up his [Mr. Sharpe's] tail" (*id.*). Mrs. Sharpe testified that "the robber with the silver gun"

was directing "the runner" where to go and what to look for (*id.* at 184).  She testified

that "the runner" went around the house, rummaging through drawers and closets and

collecting guns and cash (*id.* at 189–90).  Mrs. Sharpe testified that she went with "the

runner" into another room and helped him open a safe (*id.* at 184, 186).  She testified

that she also went with "the runner" outside to a truck, where he took money from the

center console (*id.*).  Mrs. Sharpe testified that "the robber with the silver gun" stayed

with Mr. Sharpe all the time, demanding money and threatening to kill him (*id.* at

185).  Mrs. Sharpe testified that "the robber with the silver gun" also threatened to kill

the Sharpes' two sons, and he called them by name (*id.*).  Mrs. Sharpe testified that

the "runner" never hit her, and she never saw him hit Mr. Sharpe (*id.* at 186).  Mrs.

Sharpe testified that when she was in the bedroom, "the robber with the silver gun"

told her to pull her pants down and threatened to rape her (*id.* at 186–87).  She

testified that this robber was pushing her from behind (*id.* at 187).

Mr.  Sharpe testified that "the littlest" robber with a silver gun kept hitting him

in the head with the gun (*see* Ex. A, Transcript of Trial Proceedings, pp. 203, 210).

Mr. Sharpe testified that the robber with the silver gun was the one who kept beating

him (*id.* at 205).  Sharpe testified that the "taller fellow" held a gun to Mrs. Sharpe's

head and threatened to rape her (*id.*).  Mr. Sharpe testified that the third robber was

"roaming around," and never hit him or Mrs. Sharpe (*id.* at 205–06).

The trial court's instructions to the jury included the following:

> Now, a separate crime is charged as to each defendant in each
> count of each information.  The defendants have been tried together.
> However, the charges against each defendant and the evidence applicable
> to him must be considered separately.  A finding of guilty or not guilty
> as to one of the defendants must not affect your verdict as to the other
> defendant or any other crime charged.

(*see* Ex. A, Transcript of Trial Proceedings, pp. 429–30).

Both Petitioner and co-defendant Locke were charged with home invasion

robbery with a firearm (principal) and grand theft (principal) (*see* Ex. A, Transcript

of Trial Proceedings, pp. 414–15).  To prove the crime of home invasion robbery

against each defendant, the State was required to prove that each defendant took

money or property from the person or custody of another, and force, violence, assault,

or putting in fear was used in the course of the taking.  *See* Fla. Stat. §§ 812.13,

812.135.  Evidence of the uncharged sexual offenses committed against the Sharpes

by any of the robbers was relevant to the issue of whether force, violence, assault, or

putting in fear was used in the course of the taking of the Sharpes' money and

property.  Further, Mr. Sharpe's testimony suggested that Petitioner, as the tallest

robber, was the robber who threatened to rape Mrs. Sharpe.  Therefore, Petitioner

failed to show that the testimony at issue would have been inadmissible at his trial if he had been tried alone. Additionally, the court instructed the jury that the evidence applicable to each defendant must be considered separately.

Petitioner failed to show that the jury's hearing testimony regarding the sexual assaults prevented the jury from "making a reliable judgment" as to Petitioner's guilt. Therefore, severance was not constitutionally mandated, and Attorney Shepard's failure to move for severance, on the ground that a joint trial would deprive Petitioner of a fundamentally fair trial, did not rise to the level of ineffective assistance.

Petitioner failed to demonstrate that the state court unreasonably applied Strickland in rejecting Petitioner's IATC claim regarding Attorney Shepard's failure to move to sever his trial from co-defendant Locke's. Therefore, Petitioner is not entitled to federal habeas relief on Ground Three.

      D.    <u>Ground Four: "Trial counsel rendered ineffective assistance in failing to object or move for a mistrial when the jury was provided a copy of the amended information which contained his DOC number and listed a charge which was not at issue and also alerted the jury that Mendelson was a convicted felon."</u>

Petitioner asserts the State filed an amended information on September 22, 2008 (ECF No. at 6 at 16, 29–30). Petitioner alleges the amended information included his Florida Department of Corrections ("DOC") inmate number, and a severed Count,

which charged him with possession of a firearm by a convicted felon (*id.*).  Petitioner

alleges he did not testify at trial, therefore, his prior felony conviction was not

presented to the jury (*id.*).  Petitioner alleges the jury was provided a copy of the

amended information during deliberations, thus learning that he was a convicted felon

(*id.*).  Petitioner contends Attorney Shepard was ineffective for allowing, without

objecting, the amended information to go to the jury (*id.*).

Respondent contends the state court's adjudication of this IATC claim was not

based upon an unreasonable factual finding and was not an unreasonable application

of clearly established federal law (ECF No. 16 at 10–16).[10]

### 1.   Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

### 2.   Federal Review of State Court Decision

Petitioner presented this claim as supplemental Ground V of his Rule 3.850

motion (Ex. I at 377–81).  The state circuit court adjudicated the claim as follows:

> In supplemental ground five, the Defendant asserts that his trial
> counsel rendered ineffective assistance of counsel in failing to object or
> move for a mistrial when the jury was allegedly provided with a copy of
> the amended information.  He points out that the amended information

---

[10]Although the heading of Respondent's answer to this claim states that the claim is
unexhausted, Respondent does not mention exhaustion in the body of its argument (*see* ECF No. 16
at 29–31).

references his Department of Corrections prisoner number and lists the additional charge of possession of a firearm by a convicted felon, which was not before the jury in accordance with Florida law. *See, e.g. State v. Vazquez*, 419 So. 2d 1088 (Fla. 1982) (charge of possession of a firearm by a convicted felon must be severed from other charges to avoid the prejudice from jury learning that defendant is a convicted felon); *Tucker v. State*, 884 So. 2d 168 (Fla. 2d DCA 2004). He also points out that he did not testify at trial, largely because of his status as a convicted felon, and that his status as a convicted felon and his prior incarceration on unrelated offenses was not otherwise disclosed to the jurors during trial. Citing to *McLean v. State*, 934 So. 2d 1248, 1255 (Fla. 2006), the Defendant argues that he was prejudiced because an indication that a defendant committed a collateral crime creates the risk that a conviction will be based on the defendant's bad character or propensity to commit crimes, rather than on proof that he committed the charged offense.

At the evidentiary hearing, the Court took judicial notice of the amended information. As the Defendant alleges, it included his Department of Corrections prisoner number and the charge of possession of a firearm by a convicted felon. *See* Amended Information, September 22, 2008. At the evidentiary hearing, several witnesses testified on the issue. The Defendant testified that there was a box with physical evidence and a stack of paperwork that was going back to the jury room. When the Defendant asked his trial counsel about the contents of the box, counsel allegedly said that "there is nothing but some paper, a little bit of paperwork, the charging information" and some of the physical evidence. He later realized, when speaking with postconviction counsel, that the amended information included his Department of Corrections prisoner number and the charge of possession of a firearm by a convicted felon.

The Defendant's trial counsel Shepard did not specifically recall what words he used with the Defendant. However, he also stated, "I do not recall an information going back, period." Mark Graham, the prosecutor at trial, stated that he recalled examining the evidence and materials before they were sent into the jury room. When asked if he

would have allowed the amended information to go back with the jury, he stated, "Absolutely not and I don't believe in any of my trials I've ever allowed the charging document to go back with the jury." He also testified that he had 70 or 80 of his trials before Judge Costello, the trial judge in the instant case, and he never recalled Judge Costello sending the charging document back with the jury. On redirect, Graham indicated that he was able to recall the amended information not going back with the jury because the instant prosecution was "hard to forget" and was a "very large case."

The Court finds that at the evidentiary hearing, the Defendant presented sufficient testimony to support his claim, and thereby shift the burden of proof to the State to present contradictory evidence. *Pennington*, 34 So. 3d at 154–55. However, the Court also finds that the State rebutted the Defendant's evidence. Trial counsel Shepard testified that he did not recall an amended information going back with the jury, and the Court finds Shepard's testimony on the issue to be more credible than the Defendant's. Additionally, Shepard's testimony was corroborated by Graham's testimony, whereas the Defendant's testimony lacked corroboration. Accordingly, the Court finds that the amended information did not go back with the jury in the instant case. In light of that finding, the Court concludes that trial counsel was not ineffective for purposes of the first prong of *Strickland*, with the result that the Defendant is not entitled to relief on this claim.

(Ex. I at 985–86). The First DCA affirmed this decision without written opinion (Ex. M).

The transcript of the post-conviction evidentiary hearing confirms the state court's factual findings with regard to the testimony of Petitioner, Attorney Shepard, and Mr. Graham (the prosecutor during Petitioner's trial). Petitioner testified as follows:

> At the end of trial before jury deliberations there was a box with physical evidence in it and there was a stack of paperwork that was going back to the juryroom [sic].  So I asked Rusty [Attorney Shepard] when he came back to the chair, I said, what is in the box.  And he said, well, there is nothing but some paper, a little bit of paperwork, the charging information and the stuff in the box, which is, like, I think it was like a sledge hammer, a pair of bolt cutters, some physical evidence that was taken out of Locke's car and I guess some stuff that was found in his—

(Ex. I at 1066).  Petitioner testified that the defense attorneys (Attorney Shepard and counsel for co-defendant Locke) "scanned" the physical evidence in the box, but did not look at the paperwork that was being sent back to the jury (*id.* at 1074).  Petitioner admitted he did not physically look at either the evidence or the paperwork that was being sent to the jury (*id.* at 1073–74).

Attorney Shepard testified that although he had no independent recollection of looking at all of the documents that went to the jury during deliberations, he was certain that he would have looked at any document that went to the jury, and he would have objected if the charging document was included in those documents (Ex. I at 1115–16).  Shepard testified that he did not recall the charging document being included in the group of documents going to the jury, and if the charging document had been included, he would have objected (*id.* at 1116).

Mr. Graham testified as follows on this issue:

Q [by the State].  As to the allegations in Ground Five that an information, an amended information was sent back into the juryroom [sic] with the verdict form and with the evidence in this case do you recall examining the evidence and the materials before they were sent into the juryroom?

A.  I do.

Q.  Would you as a prosecutor have allowed that document, the amended information to go back with the defendant's DOC number on it and with the additional crime of possession of a firearm by a convicted felon, which he was not on trial for, would you have allowed that to go back?

A.  Absolutely not and I don't believe in any of my trials I've ever allowed the charging document to go back with the jury.

. . . .

Q.  During your trials—How long did you practice in front of Judge Costello?

A.  I practiced in front of Judge Costello for 12 years.

Q.  Do you recall her ever sending the charging document back during that period of time?

A.  Absolutely not.  And I had probably 70 or 80 of my trials in front of her.

. . . .

Q [by Petitioner's collateral counsel].  And your testimony is that you have an independent recollection about what went back to the juryroom after this, one of many of your criminal trials that happened in 2008?

A.  On any of the big trials it was my common practice and, in fact, Judge Costello—

Q.  I'm sorry to interrupt you, maybe the state can ask you about common practice, I'm asking you about independent recollection.

A.  I don't believe the information went back to the jury.

Q.  Do you have independent recollection about whether or not it went back?

A.  Well, I just, I just don't believe it went back.

Q [by the State].  We both tried a lot of cases but you remember some cases more than others, is that what you're saying?

A.  This case is hard to forget.

Q.  Was this a big case?

A.  It was a very large case.

Q.  And is that why you're telling us what you're telling us about you recall checking the evidence in this case and the information didn't go back?

A.  In fact often times Judge Costello would prompt us, all of the attorneys please check the evidence before it goes back.  I would not have allowed an information to go back to the jury.

(Ex. I at 1126–27, 1129–30).

Based upon this testimony, the state court found as fact that the amended information did not go back with the jury.  Petitioner argues that this factual finding is unreasonable (*see* ECF No. 27 at 18–19).  Petitioner argues that Mr. Graham's

testimony "is contradicted and belied by" Rule 3.400 of the Florida Rules of Criminal

Procedure (*id.* at 18).  That rule provides:

> **(a) Discretionary Materials.**  The court may permit the jury, upon
> retiring for deliberation, to take to the jury room:
>
> (1) a copy of the charges against the defendant;
>
> (2) forms of verdict approved by the court, after being first submitted to
> counsel;
>
> (3) all things received in evidence other than depositions.  If the thing
> received in evidence is a public record or a private document which, in
> the opinion of the court, ought not to be taken from the person having it
> in custody, a copy shall be taken or sent instead of the original.
>
> **(b) Mandatory Materials.**  The court must provide the jury, upon
> retiring for deliberation, with a written copy of the instructions given to
> take to the jury room.

*See* Fla. R. Crim. P. 3.400.

Petitioner argues:

> It strains credulity to the point of an unreasonable determination
> of facts for a Court to determine this issue without any reference
> whatsoever to the governing rule [of] criminal procedure, and it further
> strains credibility past the breaking point for the prosecutor, whose
> testimony was the basis for the State court's finding that the State had
> rebutted the defense proof, to testify that "he would never have allowed
> it," when it was not a matter for him to allow or disallow, and to testify
> that in 80 trials with this judge he had never seen a charging document
> go back to the jury.  Query as well whether a finding of fact can be based
> on testimony that a witness "does not recall," or on testimony of what a
> practice would have been. Mendelson argues that a finding of fact cannot

be based on such testimony alone. The State court did not find Mendelson to not be credible, but only found his trial lawyer to be more credible.  However, his trial lawyer did not testify that the amended information did not go back with the exhibits, he testified that he did not recall.  The prosecutor likewise did not testify that the amended information did not go back to the jury, he only testified—which testimony we challenge as noted above—that it was never his practice to "allow" an information to go back to the jury.  On this record, with the State trial judge making no finding that Mendelson was not credible, and no testimony to rebut Mendelson, the State trial court's finding of fact was unreasonable.

(ECF No. 27 at 18–19).

Petitioner has not identified clear and convincing evidence to rebut the state court's factual finding that the amended information did not go to the jury room with the jury.  The mere fact that the court did not cite to the state procedural rule governing the issue does not render its factual determination unreasonable.  Further, Mr. Graham's use of the word "allow" in testifying that he would have objected to a copy of the amended information going to the jury, does not suggest his belief that he had more authority than the trial judge in determining the materials going to the jury; it merely suggests he would have objected if he had observed a copy of the amended information in the materials going to the jury.  Moreover, Petitioner's testimony that Attorney Shepard told him, "well, there is nothing but some paper, a little bit of paper work, the charging information and the stuff in the box," in response to Petitioner's

asking Shepard what was in the box, does not clearly and convincingly demonstrate that the amended information was in fact included in the materials that went back to the jury, especially since the trial transcript demonstrates that the trial judge requested that counsel review the evidence prior to sending it back to the jury (*see* Ex. A, Transcript of Trial Proceedings, p. 431), and Mr. Graham testified he would not have allowed the amended information to go back to the jury.

In light of the state court's reasonable finding that the amended information did not go to the jury room during deliberations, the state court's rejection of Petitioner's IATC claim was not an unreasonable application of <u>Strickland</u>.  Petitioner is not entitled to federal habeas relief on Ground Four.

> E.    <u>Ground Five: "The state court erred by denying appellant's Fourth Amendment claim that trial counsel rendered ineffective assistance in failing to argue a pertinent discrepancy in the motion to suppress (that is, that evidence was seized that was not authorized by the search warrant and not otherwise subject to seizure).</u>

Petitioner asserts Attorney Shepard filed a motion to suppress evidence seized pursuant to a search warrant, on the following grounds:  (1) the search warrant affidavit did not disclose that Samantha Kearns had provided numerous, contradictory statements to law enforcement regarding the robbery; and (2) the warrant affidavit did not establish probable cause to believe that evidence of the robbery would be found

in the location to be searched (the apartment shared by Petitioner and co-defendant Locke), and there was no factual nexus with the location to be searched (ECF No. 6 at 17, 30–32).  Petitioner contends Attorney Shepard was ineffective for failing to include an argument that shoes seized from the apartment were subject to suppression, because the warrant listed items to be seized, and shoes were not included in the list (*id.* at 31–32).  Petitioner alleges counsel should have further argued that even though the shoes were in plain view during execution of the search warrant, officers did not have probable cause to believe that the shoes were contraband or associated with criminal activity, thus, the illegal nature of the shoes was not immediately apparent to the officers (*id.*).  Petitioner argues that if Attorney Shepard had made these arguments, the motion to suppress would have been granted as to the seizure of the shoes, and the shoes would have been suppressed (*id.*).  Petitioner asserts he presented this claim as "part of Point One from appeal of 3.850 motion" (*id.* at 17, 30).

Respondent contends this claim is unexhausted and procedurally defaulted (ECF No. 16 at 32–36).  Respondent asserts Petitioner did not fairly present this claim to the state circuit court in his Rule 3.850 motion, because he did not allege that counsel was ineffective for failing to argue that the shoes were illegally seized and thus subject to suppression (*id.*).  Respondent contends the circuit court did not have

jurisdiction to consider a claim that was not presented in the Rule 3.850 motion itself

(*id.*).  Respondent further argues that although Petitioner included argument regarding

the shoes in his brief on appeal of the circuit court's denial of the Rule 3.850 motion,

the appellate court could not properly consider it, since it was not presented to the

lower court (*id.*).  Respondent contends Petitioner has failed to cite any authority

which would excuse his failure to exhaust, thus the claim is procedurally barred for

federal habeas purposes (*id.*).

　　　In reply, Petitioner contends he fairly presented his claim by including the

following argument at the conclusion of Ground One of his Rule 3.850 motion:

> Mendelson was prejudiced subsequently when numerous pieces
> of evidence from his apartment were entered into evidence at his trial.
> The inculpatory evidence was brought before the jury at Mendelson's
> trial despite the fact that the affidavit supporting the search warrant
> failed to establish probable cause to believe that evidence of the robbery
> would be found in the apartment.

(ECF No. 27 at 24).  Petitioner contends even if the claim was not exhausted, this

federal court may review it under <u>Martinez v. Ryan</u>, 566 U.S. 1, 14, 132 S. Ct. 1309

(2012), because it has "some merit" (*id.* at 24–29).

　　　Upon review of Petitioner's Rule 3.850 motion, the court concludes that he did

not fairly present the IATC claim he presents in Ground Five here, i.e., that counsel

was ineffective or failing to include in the motion to suppress the argument that the

seizure of a pair of shoes from the apartment was not authorized by the search warrant or pursuant to the plain view doctrine ("the shoe argument") (*see* Ex. I at 296–98). Additionally, Petitioner's presenting the IATC claim (i.e., counsel's failure to include the shoe argument in the motion to suppress) for the first time in his pro se initial brief in the Rule 3.850 appeal (Ex. J at 12–14) did not satisfy the exhaustion requirement, because the claim was procedurally barred from review by the appellate court by virtue of the fact that Petitioner did not present it in his Rule 3.850 motion. *See* Wickham v. State, 124 So. 3d 841, 856 (Fla. 2013) (claim is not preserved for appellate review in post-conviction appeal if defendant failed to raise it in his post-conviction motion) (citing Green v. State, 975 So. 2d 1090, 1104 (Fla. 2008); Henyard v. State, 883 So. 2d 753, 759 (Fla. 2004)).  In order to obtain federal review of the IATC claim presented in Ground Five, Petitioner must thus demonstrate he qualifies under an exception to the procedural bar.

Petitioner argues he qualifies under the Martinez exception.  As previously discussed, a federal court may consider the merits of a procedurally defaulted claim if the petitioner can show both "cause" for the default and "prejudice" from a violation of his constitutional right.  Wainwright v. Sykes, 433 U.S. 72, 84–85, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977).  To establish cause, a petitioner must ordinarily "demonstrate

'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting Murray, 477 U.S. at  488).  Before its 2012 decision in Martinez, the Supreme Court had long held that § 2254 petitioners cannot rely on errors made by their state collateral counsel to establish cause. *See* Coleman, 501 U.S. at 752–53. Martinez created a limited, equitable exception to Coleman where, (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," as opposed to on direct appeal; (2) "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of Strickland [v. Washington, 466 U.S. 668 (1984)]"; and (3) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." Martinez, 566 U. S. at 14 (citations omitted).  Accordingly, the petitioner must "establish that his collateral counsel's conduct 'fell below an objective standard of reasonableness,' and that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Hittson v. GDCP Warden, 759 F.3d 1210, 1262 (11th Cir. 2014) (quoting Strickland, 466 U.S. at 688).

In Hittson, the Eleventh Circuit explained:

> [T]he merits of the underlying claim is only a part of the Strickland analysis.  With unlimited time and the benefit of hindsight, a

petitioner can come up with any number of potentially meritorious ineffective-assistance claims that he now wishes his collateral counsel had raised.  However, a petitioner does not establish constitutionally defective performance simply by showing that (a) potentially meritorious claims existed and (b) his collateral counsel failed to raise those claims. Murray, 477 U.S. at 486, 106 S. Ct. at 2644 ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.").  "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. 745, 751–52, 103 S. Ct. 3308, 3313, 77 L. Ed. 2d 987 (1983).  "[A] per se rule that . . . the professional advocate, [is not] allowed to decide what issues are to be pressed . . . seriously undermines the ability of counsel to present the client's case in accord with counsel's professional evaluation." Id. at 751, 103 S. Ct. at 3313.

        As we have explained, Strickland instructs courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"—that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 689–90, 104 S. Ct. at 2065–66.  To overcome this presumption, a petitioner must "establish that no competent counsel would have taken the action that his counsel did take."  Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

        Thus, to show that his habeas counsel failed to provide the level of representation required by Strickland, [the petitioner] must show more than the mere fact they failed to raise potentially meritorious claims; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted those claims.

Hittson, 759 F.3d at 1263 (footnote omitted).

Here, Petitioner argues only the third prong of the Martinez standard, i.e., that his underlying IATC claim is "substantial" (*see* ECF No. 27 at 25–29). But Martinez requires more. To qualify for review under Martinez, Petitioner must show that his collateral counsel was ineffective for failing to present the IATC claim in the Rule 3.850 proceeding, in other words, that no competent counsel, in the exercise of reasonable professional judgment, would have omitted the claim. Petitioner has offered no argument on the "ineffectiveness" prong of the Martinez standard. But even if he made that arguement, it would be unconvincing, because there is no reasonable probability that the state post-conviction court's ruling would have been any different if Petitioner's collateral counsel had argued that Attorney Shepard was ineffective for failing to argue that the seizure of the shoes was not authorized by the search warrant or the plain view doctrine.

Investigator Karen Colbert testified at trial that prior to execution of the search warrant, which occurred on September 27, 2007, she photographed a footwear impression discovered at the scene of the robbery and made a "lift" of the impression (Ex. A, Transcript of Trial proceedings, pp. 233–38). Investigator Colbert testified that after she took the photographs and made the lift, and after officers obtained the search warrant for the apartment where Petitioner and co-defendant Locke lived,

Colbert participated in the search of the apartment (*id.*, pp. 247–49). Colbert testified that she observed a pair of shoes beside the bed in Petitioner's bedroom and another pair in the bedroom closet (*id.*). Investigator Colbert testified that the treads of one pair appeared to be similar to the treads she observed at the scene of the robbery (*id.*).

Based upon this evidence, Petitioner's collateral counsel could have reasonably concluded that an IATC claim based upon Attorney Shepard's failure to include the shoe argument in the motion to suppress would not have been meritorious. Additionally, there is no reasonable probability the post-conviction court would have granted relief on this IATC claim if collateral counsel had presented it.

In sum, Petitioner failed to exhaust an IATC claim based upon Attorney Shepard's failure to include the shoe argument in the motion to suppress. Further, Petitioner failed to show he qualifies for federal review of the IATC claim through the Martinez exception. Therefore, Petitioner is not entitled to relief on Ground Five.

F.    Ground Six: "The post conviction court erred in denying Ground Four of Mendelson's 3.850 motion after acknowledging an organic violation of Mendelson's right to effective assistance of counsel (that is, that counsel's closing argument incriminated Mendelson and was done without consulting with and obtaining Mendelson's agreement)."

Petitioner asserts that during Attorney Shepard's closing argument at trial, Shepard argued that the evidence pointed to co-defendant Locke's guilt (ECF No. 6

at 17, 32–34).  Petitioner argues that because he was charged as a principal, Attorney Shepard's argument essentially conceded his guilt (*id.*).  Petitioner contends Shepard's conceding his guilt without consulting him regarding this strategy and obtaining his consent constituted ineffective assistance (*id.*).  Petitioner asserts he presented this IATC claim as "Point Four A from appeal of Rule 3.850 motion" (*id.* at 17, 32).

Respondent contends this claim is unexhausted and procedurally defaulted (ECF No. 16 at 36–38).  Respondent asserts Petitioner did not fairly present this claim to the state circuit court in his Rule 3.850 motion, because he did not allege that counsel was ineffective for giving closing argument which incriminated him without obtaining Petitioner's consent (*id.*).  Respondent contends the circuit court did not have jurisdiction to consider a claim that was not presented in the Rule 3.850 motion itself (*id.*).  Respondent further argues that although Petitioner presented this claim to the First DCA on appeal of the circuit court's denial of the Rule 3.850 motion, the appellate court could not properly consider it, since it was not presented to the lower court (*id.*).  Respondent contends Petitioner has failed to cite any authority which would excuse his failure to exhaust, thus the claim is procedurally barred for federal habeas purposes (*id.*).

In reply, Petitioner asks this court to consider his response to the exhaustion and procedural bar arguments he presented in his Reply to Ground Five *supra* (*see* ECF No. 27 at 30).

In Petitioner's Rule 3.850 motion, Petitioner did not fairly present the IATC claim he presents in Ground Six here, i.e., that counsel was ineffective for conceding his guilt during closing argument without his consent (*see* Ex. I at 296–98). Additionally, Petitioner's presenting the IATC claim for the first time in his pro se initial brief in the Rule 3.850 appeal (Ex. J at 36–41) did not satisfy the exhaustion requirement, because the claim was procedurally barred from review by the appellate court by virtue of the fact that Petitioner did not raise it in his Rule 3.850 motion. *See* Wickham, 124 So. 3d at 856 (citations omitted).  In order to obtain federal review of the IATC claim presented in Ground Six, Petitioner must thus demonstrate he qualifies under an exception to the procedural bar.

Petitioner relies upon the procedural bar argument presented in his Reply to Ground Five *supra*, apparently referring to his Martinez argument.  However, as discussed *supra* in Ground Five, Petitioner argued only one prong of the Martinez standard, i.e., the "substantial claim" prong.  Petitioner has not satisfied the second

prong, i.e., that Petitioner's collateral counsel was ineffective for failing to present an IATC claim based upon Attorney Shepard's closing argument.

The trial transcript demonstrates that during closing argument, Attorney Shepard argued that the State was trying to "lump Mr. Mendelson and Mr. Locke in together" (Ex. A, Transcript of Trial Proceedings, p. 386–401). Shepard argued, "But there is no guilt by association. You must look at the evidence to each individual because they are very, very different cases." Attorney Shepard argued that the only unbiased witnesses were the Sharpes (the victims). Shepard argued that the Sharpes described all three robbers as small, approximately 5'6" or 5'7", and that they wore masks. Shepard argued that Petitioner was tall, as the jury could see from their observation of him in the courtroom. Attorney Shepard argued that the only witnesses who implicated Petitioner in the robbery, i.e., Samantha Kearns, Justin Griffin, and Patrick Wilson, were biased, and the only reason they testified was to prevent their plea deals with the State from falling apart. Shepard argued that Patrick Wilson admitted that he wore the same kind of shoes as Petitioner. Attorney Shepard argued that none of Petitioner's fingerprints were found on any of the items seized during the search of the apartment shared by Petitioner and co-defendant Locke. Shepard also argued that many of the items seized during the search were located in in Locke's car

and bedroom, as well as common areas of the apartment, which were areas that could

be attributed to Locke.  Attorney Shepard concluded his argument as follows:

> So let's go back and take a look at this.  Where was the jewelry seen?  It was seen in the possession of Mr. Wilson and Ms. Kearns.  And it was found in the possession of Mr. Locke.  There was a good deal made about cash that was distributed.  Did you hear anything about any cash that Mr. Mendelson had?  No.  Did you hear about black clips where everything is kept in a black clip?  Did you hear anything about a black clip found in Mr. Mendelson's room?  No.  No.  Conversely, you have Patrick Wilson who has no problems hiding the fruit of this crime, burying it in the neighbor's yard.  He's 5'6", 5'7".  You've got Justin Griffin who we know is the tall one.  Said that to Mr. Sharpe.  He's 5'9".

> State's going to show you this video probably again here in a second.  And if you look at it, it is grainy, everything like that.  But the one thing you notice is it is up and it is on an angle and some people are running closer, somebody people [sic] are running a little further away.  There may be one or two that is shorter, I don't know, it is difficult to tell from the angle.  But there is not one that is seven or eight inches taller, that's for sure.

> The other thing I'm going to rely upon are [sic] your observations of Mr. Locke and his height and whether or not he matches the physical description given by the Sharpes.  And I would submit to you he does.  When you take into account that Justin Griffin and Samantha Kearns together had the knowledge of the Sharpes' business, had the motive to need the money, had the ability to hide the money, okay, the fact that Patrick Wilson matches the physical description of one of the robbers, the fact that they didn't even get the shoes that he says that he wore that are consistent with what the investigator said that he found on the foot print on the wall, I would submit to you that there is absolutely, that he is absolutely the other robber in this case.  And I think when you go back there and you think about the charge conference, you're going to get a verdict form, one of the things that you're going to find on it is that there

is nothing on here that is going to say guilty by association.  And when you look at the evidence in this case there are three people who are guilty.  That is Justin Griffin, David Locke and Patrick Wilson.  Buts [sic] not Jason Mendelson.  And I think when you consider all of the evidence your proper verdict will be not guilty.

(Ex. A, Transcript of Trial Proceedings, pp. 400–01).

Collateral counsel could have reasonably concluded that an IATC claim based upon the theory that Attorney Shepard admitted Petitioner's guilt during closing argument had little chance of success.  Further, there is no reasonable probability that the outcome of the Rule 3.850 proceeding would have been different if Petitioner's collateral counsel had presented that IATC claim.  Therefore, Petitioner failed to overcome the procedural bar with respect to Ground Six, and is thus not entitled to federal habeas relief on the claim.

G.    Ground Seven:  "The finding that Mendelson was a prison releasee reoffender violated Apprendi v. New Jersey, 530 U.S. 466 (2000), and the Sixth Amendment right to a trial by jury."

Petitioner asserts his sentence was increased due to the fact that he had previously been convicted of a felony, and the fact that he committed the robbery within three years after being released from prison (ECF No. 6 at 17, 34–35).  Petitioner asserts neither of these facts was mentioned in the charging document or found by a jury beyond a reasonable doubt; instead, the trial court found these facts

using a preponderance of the evidence standard (*id.*). Petitioner contends the state court's application of the sentence enhancement violated his Sixth Amendment right to a jury trial (*id.*). Petitioner acknowledges that in <u>Almendarez-Torres v. United States</u>, 523 U.S. 224 (1997), the Supreme Court held that a prior aggravated felony conviction enhancement under 8 U.S.C. § 1326(b) was not an element of the offense but instead a sentencing factor, therefore, there was no due process violation in applying the sentence enhancement even though the fact of the prior conviction had not been alleged in the charging document (ECF No. 16 at 30–46). However, Petitioner contends his claim is based upon the Sixth Amendment right to a jury, not the notice requirement of the Due Process Clause (*id.* at 30–32). Petitioner additionally argues that subsequent Supreme Court decisions have signaled the Supreme Court's willingness to recede from or overrule <u>Almendarez-Torres</u> (*id.* at 32–46). Petitioner asserts he presented this claim to the state courts in a Rule 3.800 motion (ECF No. 6 at 17, 34).

Respondent contends the state court's rejection of his this claim was not an unreasonable application of clearly established federal law (ECF No. 16 at 38–40).

1.    Clearly Established Federal Law

In Apprendi v. New Jersey, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). With that exception, the Court endorsed the following rule:  "It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.  It is equally clear that such facts must be established by proof beyond a reasonable doubt."  *Id.*, 530 U.S. at 490.  The "statutory maximum" for Apprendi purposes "is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."  Blakely v. Washington, 542 U.S. 296, 303, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

### 2.    Federal Review of State Court Decision

Petitioner presented this claim in a Rule 3.800 motion (Ex. Q at 1–17).  The state circuit court adjudicated the claim as follows:

> After a jury trial, the Defendant was convicted of home invasion robbery with a firearm and grand theft.  *See* Judgment and Sentence. The Court determined that he was a prison releasee reoffender (PRR), and sentenced him as a PRR to concurrent terms of life in prison for home invasion robbery with a firearm and five years for grand theft.  *See* Order Determining Prison Releasee Reoffender; Judgment and Sentence.

His direct appeal resulted in a per curiam affirmance. *Mendelson v. State*, 37 So. 3d 853 (Fla. 1st DCA 2010). The Defendant later filed a Rule 3.850 Motion, but it was denied after an evidentiary hearing, and the denial was affirmed, per curiam, in *Mendelson v. State*, 151 So. 3d 1237 (Fla. 1st DCA 2014).

Under Florida law, a defendant who has committed one of the enumerated offenses in section 775.082(9)(a)1., Florida Statutes "within 3 years after being released from a state correctional facility operated by the Department of Corrections" is subject to sentencing as a PRR. The State is required to prove by a preponderance of the evidence that a defendant is a PRR. *See* § 775.082(9)(a)3. In the instant case, the Defendant's offense of home invasion robbery with a firearm is one of the enumerated offenses in the PRR statute. *See* § 775.082(9)(a)1.f. Since the offense is a first degree felony punishable by life, section 812.135(2)(a), the PRR statute requires a sentence of life in prison for it. *See* § 775.082(9)(a)3.a.

In the instant motion, the Defendant argues that the Court's finding that he qualified for sentencing as a PRR violated Apprendi v. New Jersey, 120 S. Ct. 2348, 2362–63 (2000), which held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." He urges that under Apprendi, his PRR sentence was improper because he was found to be a PRR due to facts not charged in the information or proven beyond a reasonable doubt by a jury. He also urges that the opinion of the First District Court of Appeal in *Williams v. State*, 143 So. 3d 423 (Fla. 1st DCA), *review denied*, 157 So. 3d 1052 (Fla. 2014) was "wrongly decided." *Williams* determined that *Apprendi* does not apply to PRR sentences, explaining, "The key fact pertinent to PRR sentencing—whether the defendant committed the charged offense within three years of release from prison—is not an ingredient of the charged offense. Rather, it relates to the fact of a prior conviction." *Williams*, 143 So. 3d at 424.

> The Defendant's *Apprendi* claim appears to be cognizable under Rule 3.800(a). *See Plott v. State*, 148 So. 3d 90 (Fla. 2014). Nonetheless, the Court finds that the Defendant's Motion is due to be denied. The Court does not agree that *Williams* was "wrongly decided," and in any event is obliged to follow *Williams* and Florida Supreme Court decisions holding that *Apprendi* does not apply to PRR sentences. *See Robinson v. State*, 793 So. 2d 891 (Fla. 2001); *McGregor v. State*, 789 So. 2d 976 (Fla. 2001); *Williams v. State*, 143 So. 3d 423 (Fla. 1st DCA), *review denied*, 157 So. 3d 1052 (Fla. 2014). *See also Lopez v. State*, 135 So. 3d 539 (Fla. 2d DCA 2014); *Gurley v. State*, 906 So. 2d 1264 (Fla. 4th DCA), *review denied*, 915 So. 2d 1196 (Fla. 2005), *cert. denied*, 126 S. Ct. 1153 (2006).

(Ex. Q at 20–21). The First DCA affirmed the lower court's decision without written opinion (Ex. S).

Petitioner's PRR sentence was based upon the fact that he committed the robbery within three years of the date he was released from the DOC. The state court reasonably concluded that this fact was analogous to the fact of a prior conviction as it demonstrated recidivism. Under Apprendi, which honored the holding of Almendarez–Torres v. United States, 523 U.S. 224, 228, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), the Sixth Amendment does not require the fact of a prior conviction to be submitted to a jury and proven beyond a reasonable doubt.

Petitioner may be correct that, based upon dicta in the Supreme Court's post-Apprendi opinions, and concurring and dissenting opinions in those cases, the Supreme Court may overrule Almendarez–Torres in the future. However, the

Supreme Court has not done so yet and, more importantly, had not done so at the time the state court adjudicated Petitioner's claim.

Petitioner failed to demonstrate that the state court's adjudication of his Sixth Amendment challenge to his PRR sentence was contrary to or an unreasonable application of clearly established federal law as it existed at the time of the state court's adjudication.  Therefore, Petitioner is not entitled to federal habeas relief on Ground Seven.

## V.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting

§ 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  Buck v. Davis, 580 U.S.—, 137 S. Ct. 773 (2017) (citing Miller-El, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the amended petition for writ of habeas corpus (ECF No. 6) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>12</u><sup>th</sup> day of February 2018.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**